THEODORE C. PELTZER et al., Appellants, v. HUGH C. GILBERT et al., Judges of County Court.

**In Banc, July 14, 1914.**

1. **PLEADINGS:  Improper Motive of Plaintiffs:  Equity Suit.** The general rule seems to be that the improper motives and misconduct of a plaintiff which would prevent him from securing the relief from a court of chancery he asks for, may be shown during the trial without having been pleaded; but, nevertheless, it would be more in harmony with the rules of good

pleading for defendants to specifically challenge in their answer plaintiff's motives in seeking the aid of the court.

2. **INJUNCTION: Suit By Taxpayer to Enjoin County Court from Paying Costs of Murder Case: Good Faith.** A suit by a taxpayer to enjoin the county court from auditing and paying out of the county treasury certain expenses, deemed necessary to incur by the prosecuting attorney in the prosecuting of a murder case, in order to secure the attendance of witnesses residing outside of the State, will not be upheld where it is shown that the suit is not brought in good faith by the taxpayer for the protection of his own interests, but that he is merely a colorable plaintiff, suing in behalf of other parties in interest. In such case the doctrine of "clean hands" applies with special force.

3. ———: ———: **Covinous Procurement: Payment of Attorney's Fee.** *Held,* by BROWN, J., with whom GRAVES and BOND, JJ., concur, that, in such case where such suit is brought by a single taxpayer whose taxes amount to only a few dollars and who does not ask any other person to join with him in the suit; where he paid the attorney who brought the suit in his name a fee of $100, was anxious to know just what his fee would be, and was told by the attorney that he could fix that to suit himself; where said attorney by telephone called the office of the attorneys for the defendant in the murder case and asked for a certain member of the firm, and stated, though perhaps not to the member of the firm called, that he had been informed by the said taxpayer that no arrangements had been made in regard to his fee and he would like to know about it, and terminated the conversation by answering "all right," it should be held said injunction suit was brought primarily for the purpose of impeding the prosecution of the murder case, and should be dismissed. *Held,* by LAMM, C. J., with whom FARIS, J., concurs, that a taxpayer, however small the amount of taxes he pays, has a right to maintain injunction to prevent the illegal use of public moneys, and the evidence is not sufficient to show collusion or covin between the plaintiff or his attorneys and the defendant in the murder case or his attorneys, and creates only a suspicion, and a judgment of "unclean hands" would be based on mere conjecture. *Held,* by WOODSON, J., and WALKER, J., in separate dissenting opinions, that the costs of prosecuting felonies devolve upon the State and not upon the county, and the county court could not pay out moneys to secure non-resident expert witnesses for the State without violating the law, and the court should not, by indirection (namely, the dismissal of the suit on the ground that the defendant in the murder case had a shadowy connection with bringing the suit) lend its apparent approval to such an unlawful use of county funds. *Held, per curiam,* that, there be-

ing no majority opinion, the judgment for defendants should be reversed, and the cause remanded for further proof upon the question of covinous procurement by the defendant in the murder case or his attorneys, in having the suit brought for his benefit, as a means of protecting him from further prosecution.

Appeal from Jackson Circuit Court.—*Hon. Allen C. Southern,* Judge.

Reversed and remanded.

*Hughes & Whitsett* for appellants.

(1) Although the county court is a constitutional court, it only has such powers and duties as may be prescribed by law. Constitution, art. 6, secs. 1 and 36; State v. Shortridge, 56 Mo. 126; Butler v. Sullivan Co., 108 Mo. 630; Walcott v. Lawrence Co., 26 Mo. 272; Steins v. Franklin Co., 48 Mo. 167; State ex rel. v. Harris, 96 Mo. 29. (2) So long as they act within their prescribed limits, their acts are valid, but whenever they step beyond their acts are void. Saline Co. v. Wilson, 61 Mo. 237; Sturgeon v. Hampton, 88 Mo. 203; Butler v. Sullivan Co., 108 Mo. 630; Alderson v. St. Charles Co., 6 Mo. App. 426; Cape Girardeau Co. v. Hatton, 102 Mo. 56; Phillips v. Butler Co., 187 Mo. 698. (3) Injunction lies at the suit of a taxpayer to restrain the illegal diversion of public funds which municipal officers in charge of the fund are about to make. State ex rel. v. Heager, 91 Mo. 452; Black v. Ross, 37 Mo. App. 250; Black v. Ross, 30 Mo. App. 641; Newmeyer v. Railroad, 52 Mo. 82; Ranney v. Bader, 67 Mo. 476; Ruby v. Shaine, 54 Mo. 207. (4) The powers and duties of the county court with respect to disbursing county funds is defined in Constitution, art. 6, sec. 36, and sec. 3781, R. S. 1909. (5) The costs of expert witnesses, beyond the ordinary witness fees, cannot be charged against either the State or county in any criminal case. Shed v. Railroad, 67 Mo. 687;

Williams v. Chariton Co., 85 Mo. 646; St. Louis v. Metz, 107 Mo. 611; Ford v. Railway, 29 Mo. App. 616; In re Green, 40 Mo. App. 491; In re Murphy v. Spillane, 22 Mo. App. 476; State ex rel. v. Seibert, 130 Mo. 216; State v. Oliver, 50 Mo. App. 222; State v. Oliver, 116 Mo. 195; State v. Wilder, 197 Mo. 32; Burnett v. Freeman, 125 Mo. App. 683; Burnett v. Freeman, 134 Mo. App. 709. (6) No costs or expenses are chargeable against the county in a murder case. (a) In misdemeanors under certain conditions may be paid by county. Secs. 5378, 5379, 5381, R. S. 1909; State v. Williams, 92 Mo. App. 450; State v. Wilder, 199 Mo. 27. (b) In all felonies the State is liable in certain contingencies. Sec. 5377, R. S. 1909. (c) Fee bills to be made out and certified. Secs. 5392, 5396, 5398 and 5899, R. S. 1909; Kelly v. Andrew Co., 43 Mo. 338; Finney v. Sullivan Co., 48 Mo. 350; State v. Dailey, 45 Mo. 153. (7) The statute makes it criminal for county judges to pay costs in criminal cases in any other manner. R. S. 1909, secs. 4560, 4561 and 4562. (8) The manner in which taxes shall be levied and apportioned to various funds. R. S. 1909, secs. 11416 and 11423; Contingent fund, subdiv. 5, sec. 11423, and also sec. 11418. (9) There is no proof in the record and none was offered to show any necessity for these witnesses in the trial of the Hyde case, or that the witnesses were necessary, or that they would not attend court under process, or that they do not all live in Jackson county, in the jurisdiction of the court.

*Rozelle, Vineyard & Thacher, Floyd E. Jacobs* and *Joseph S. Brooks* for respondents.

(1) Rule as to granting injunction. The annual income and revenue of Jackson county is more than $1,800,000. On this basis not more than a few cents of the taxes the appellants would pay in 1914 would in

any event be applied to the payment of these bills. A simple calculation will show that the mere expense of printing appellants' brief exceeds more than a thousand times the proportionate part of their taxes that would be applied to pay these bills. "A court of equity . . . is never active in relief against conscience or public convenience. . . . It is fundamental that 'an action is of right, and an injunction is of grace.' Equity requires in such proceedings as this that the chancellor balance the inconveniences likely to be incurred by the respective parties, by means of the action of the court, and grant the injunction or withhold it, according to a sound discretion." Johnson v. Railroad, 227 Mo. 450. "A court of equity will not grant an injunction . . . where the injury is small or technical" Warren v Cavanaugh, 33 Mo. App. 109. (2) The appellants contend that the county court cannot pay for the services of toxicologists, although such services are necessary to the performance of the duties imposed by law upon the prosecuting attorney and the criminal court. This contention is based on the ground that such expenses cannot be taxed as costs. The toxicologists have at the instance of the prosecuting attorney made extensive chemical examinations of the viscera. This is the basis of the compensation demanded by them. City of St. Louis v. Meintz, 107 Mo. 615. Some of the cases hold that an expert witness is not entitled to compensation other than witness fees, but even these cases all decide that such a witness cannot be required to make any examination or preliminary preparation, nor can he be compelled to attend the trial and listen to the testimony that he may be better enabled to give his opinion as an expert. On the contrary, it is held in all cases that for services of this kind he may demand extra compensation. People v. Montgomery, 13 Abb. Pr. (N. S.) 240. (3) The administration of public justice is not only a necessary object of government, but one

of the highest for which it is organized. The protection of life and the conservation of peace and good order in the State cannot remain in abeyance. The payment of taxes is the price the citizen pays for this security. Section 4 of article 2 of the Constitution declares that "to give security to these things is the principal office of government, and when government does not confer this security it fails of its chief design." It would be a burlesque upon the law—a just and indefensible reproach upon our institutions—if crimes should go unpunished, persons accused of murder should remain untried for want of power in the officials of the county where the alleged crime was committed to pay out of the public funds the expenses reasonably necessary to establish the facts. Schmelzel v. Board of Commissioners, 16 Idaho, 32, 21 L. R. A. (N. S.) 199; Allegheny County v. Watt, 3 Pa. St. 462; State ex rel. v. Davis, 26 Nev. 373; Vigo County v. Stout, 136 Ind. 53; Re Supreme Court Janitor, 35 Wis. 410; Stowell v. Jackson County, 57 Mich. 31; Bates v. Independence County, 23 Ark. 722; Fernekes v. Milwaukee County, 43 Wis. 303; State ex rel. v. Armstrong, 19 Ohio St. 116; Gaston v. Marion County, 3 Ind. 497; Forquarson v. Yergin, 24 Wash. 549; Cooley on Constitutional Lim. (7 Ed.), p. 878; St. Francis County v. Cummings, 55 Ark. 419; People v. Supervisors, 30 How. Pr. 173; Washoe County v. Humboldt County, 14 Nev. 134; White v. Polk County, 7 Iowa, 416; County of Northampton v. Innes, 26 Pa. St. (4 Casey) 156; Venango County v. Durban, 3 Grant's Cases (Pa.) 66; Boone County v. Todd, 3 Mo. 140; Blades v. Hawkins, 240 Mo. 195; 23 Am. & Eng. Ency. Law, 364; State ex rel. v. Gates, 67 Mo. 139; State ex rel. v. Lamb, 237 Mo. 448; Secs. 3958, 4081, R. S. 1909; State ex rel. v. Smith, 5 Mo. App. 427; Meador v. Texas County, 167 Mo. 201; State ex rel. v. County Court, 83 Mo. 539; Sparks v. Jasper County, 213 Mo. 240. (4) The preliminary arrangement of the county

court with the prosecuting attorney for the payment of the reasonable value of certain necessary services to be procured by the State in the Hyde trial, would, if carried out, be the exercise of judicial and not ministerial power and injunction by appellants is not the proper remedy. Benton County v. Morgan, 163 Mo. 673; Gray v. Bowles, 74 Mo. 423; Babb v. Bruere, 23 Mo. App. 606; In the Matter of Garland, 71 U. S. (4 Wall.) 349; State ex rel. v. Brandhorst, 156 Mo. 457; Burnam v. Terrell, 97 Tex. 315; Meador v. Texas County, 167 Mo. 201; State ex rel. v. County Court, 83 Mo. 539. (5) The case cannot be tried without the testimony of the toxicologists who examined the viscera of the deceased. The Constitution is mandatory that the accused shall be entitled "to meet the witnesses against him face to face." Did the constitutional convention that framed and the sovereign people who adopted this organic law and confided each of the departments of government to a separate, exclusive and independent magistracy, contemplate that the legislative department by neglecting to enact a specific statute could bring to a standstill the wheels of criminal justice? Railroad v. Gildersleeve, 219 Mo. 170. We believe that under Sec. 3958, R. S. 1909, as well as under the Constitution and other provisions of the statutes, the county court has the implied, if not the inherent, power to incur this necessary expense, payable out of public funds. This court has often said that "whatever the law will imply is as much part and parcel of a legislative enactment as though in terms inserted therein." State ex rel. v. Mason, 155 Mo. 500. The same rule of construction applies to the provisions of the Constitution. The law never contemplated that the ends of justice should be sacrificed upon the sharp edge of technicality. R. S. 1909, sec. 2082. (6) Upon the county court devolves the duty of administering the county business and the devolution of such duty upon it necessarily implies the right to use the fit and

appropriate means of carrying such business into effect, and while it is true the law is strict in limiting the authority of county courts, it never has been held that they have no authority except what the statutes confer. The universal doctrine is that certain incidental powers germane to the authority and duties expressly delegated are indispensable to their performance and may be exercised. Ewing v. Vernon County, 216 Mo. 692; Harkreader v. Vernon County, 216 Mo. 696; Motley v. Pike County, 233 Mo. 46; Blades v. Hawkins, 133 Mo. App. 328, 240 Mo. 187; Boggs v. Caldwell County, 28 Mo. 586; Sayler v. Nodaway County, 159 Mo. 520; Gammon v. Lafayette County, 79 Mo. 223; Railroad v. Marion Co., 36 Mo. 294; Boone County v. Todd, 3 Mo. 140; County Court v. Ruland, 5 Mo. 269. (7) It is the duty of a county to pay the expenses of the local administration of justice within the county, and this duty may arise as well from the general system of county organization as from express statute defining the duties of counties on this particular subject. 7 Am. & Eng. Ency. Law, 955. (8) The county court having the implied power to provide for the payment of expenses necessary (but not expressly given) for the administration of the offices of sheriff, circuit clerk, recorder of deeds, etc., has also the implied power to provide for the payment of expenses necessary for the administration of justice in the office of the prosecuting attorney.

BROWN, J.—Action to restrain defendants from auditing and causing to be paid out of the county treasury certain expenses in a criminal case.

The plaintiffs bring this action in equity as taxpayers of Jackson county, to enjoin the defendants as judges of the county court of that county from auditing, allowing and causing to be paid out of the public funds of said county the sum of $15,000, which defendants are threatening to expend in defraying the cost

of bringing into this State numerous physicians and other persons to be used as witnesses on behalf of the prosecution in the case of State v. B. Clark Hyde, charged with the crime of murder in the first degree. Plaintiffs also ask that defendants by mandatory injunction be compelled to restore to the treasury of Jackson county the sum of $8,974.04, which it is charged they have heretofore audited and caused to be expended from the public funds of said county in securing expert witnesses, and for other services, in a former trial of said B. Clark Hyde upon the same charge which is now pending against him.

Plaintiffs do not charge that defendants have acted fraudulently or corruptly in causing the public funds of said county to be paid out in defraying the expenses of the trial of said case of State v. Hyde; nor in the threatened expenditure of other moneys in that behalf, but the gist of their complaint is that there is no law empowering defendants as such judges to audit and cause such expenses to be paid; and that while defendants would be personally liable for causing such an unlawful disbursement of public funds, the right to sue for such misappropriated funds "resides with the county" and plaintiffs will possess no individual right to maintain an action or actions at law to recover such funds for the county after they have been unlawfully audited and disbursed.

The particular order entered by defendants regarding future disbursements of which petitioners complain is predicated upon a letter written by the prosecuting attorney of Jackson county, which letter and the order made pursuant thereto are as follows:

December 18, 1913.

To the Honorable County Court of Jackson County, Mo.,
    Kansas City, Missouri.
Gentlemen:
    I am submitting this letter to you in pursuance to our conversation of yesterday relative to the financing of the coming trial of the State of Missouri *versus* Hyde.

Of course it is impossible for me to definitely state how much money will be required to try this case, since that is altogether regulated by the length of time which the nurses and experts and other witnesses from outside the State remain in Kansas City. During the last trial one expert in particular, Dr. Wesner, was in Kansas City for several weeks, and I am hoping that no such condition will arise this time. This would materially cut the expenses in this case. However, for expert testimony and the bringing of a large number of witnesses from all parts of the United States I estimate that $15,000 will cover the expenses of this trial.

Of course I am not asking for any money to be placed in my hands—only the right to get these people to come here and to have them paid by the court. I want no funds of any character or description to be placed in my hands. I will say this to the court—that I shall be as economical as possible in the trial of this case, and it will please me probably more than any one else if the expenses of this trial can be greatly reduced.

Trusting this letter meets your requirements and you can each of you vote to allow the funds to try this very important murder case, I beg to remain,

Respectfully yours,

FLOYD E. JACOBS.


ORDER.

This cause now coming on for hearing the court orders, by unanimous vote, that in compliance with the above communication from the county prosecuting attorney dated December 18, 1913, requesting this court to pay out of the general funds of Jackson county, Missouri, the expenses [estimated by said prosecuting attorney at not to exceed fifteen thousand dollars] for the payment of expert witnesses and the expenses of bringing a large number of witnesses to Kansas City, Missouri, from different locations in the United States for the trial of the case of State of Missouri v. B. Clark Hyde, that said expenses be paid out of the general funds of the said county upon the presentation to the court of said bills approved by the prosecuting attorney.

The defendants by answer assert that the money which they intend to disburse out of the public funds of Jackson county is a necessary expenditure to procure the attendance of witnesses residing outside the State of Missouri. That said witnesses have made a chemical analysis of the stomach and other vital organs

of one Thomas H. Swope, the person who it is charged was murdered by B. Clark Hyde. That the presence of such physicians and other non-resident witnesses is necessary to prove the charge which the public prosecutor has preferred against said Hyde. That the public prosecutor has no authority to compel the aforesaid non-resident witnesses to attend the trial of said B. Clark Hyde, and cannot procure their attendance in any way except by paying them a reasonable sum for their time to be consumed and expenses to be incurred in attending said trial. For further answer defendants admit that plaintiffs are taxpayers of Jackson county, but assert that the amount of taxes which plaintiffs have paid and the amount which they might have to pay towards defraying the expenses complained of would not amount to more than three cents each; and that such amount is so trivial that the court ought not to take jurisdiction of the cause and grant the relief prayed for.

All the evidence introduced by defendants quite clearly demonstrates that they are seeking to defeat this case by showing that plaintiffs are not prosecuting the action in good faith to prevent the unlawful disbursement of public funds; and that the chief purpose of the action is to impede or render impossible the successful prosecution of B. Clark Hyde. It is true that the asserted improper motives of plaintiffs, and the alleged fact that they did not come into court with clean hands, are not pleaded by defendants. It would have been more in harmony with the rules of good pleading for defendants to have specifically challenged the motives of plaintiffs in their answer filed herein, but the general rule seems to be that the improper motives or misconduct of a plaintiff which would prevent him from securing relief from a court of chancery may be shown during the trial of the cause without being pleaded at all. [16

**Pleading.**

Cyc. 148; Creamer v. Bivert, 214 Mo. 473, l. c. 485; Houtz v. Hellman, 228 Mo. 655, l. c. 671.]

We will now review the evidence which tends to prove the motives of the plaintiffs and their attorneys in prosecuting this suit:

In the trial of this cause it was shown that plaintiff Peltzer paid to Jackson county, through its collector, taxes aggregating $16.25 for and during the year 1912, and that plaintiff Bowling paid to said county sixty-one cents for the same year. Roland Hughes is the principal attorney for plaintiffs in the prosecution of this action. The firm of Johnson & Lucas and one Cleary were some of the attorneys employed by B. Clark Hyde to defend him against the before-mentioned charge of murder.

To prove that this suit was brought and maintained at the suggestion and expense of the attorneys of B. Clark Hyde, or for the benefit of said Hyde, the defendant introduced one James W. Broaddus, who testified as follows:

"My name is James W. Broaddus. I am an attorney, have been since last June. My office is with my grandfather, E. J. Broaddus, formerly judge of the Court of Appeals in this district, at 1305 Commerce building. I know where Hughes & Whitsett's office is on the same floor with ours. Mr. Hughes uses our Bell phone once in awhile.

"Q. I will ask you whether or not Mr. Hughes came in there a few days ago and had a conversation in which he called up Johnson & Lucas's office? A. Monday afternoon, the 12th of this month.

"Q. What was said, if anything? What was said in that conversation, the first thing that was said?

"Mr. Hughes: We object to that conversation as immaterial and irrelevant.

"The Presiding Judge: The objection will be sustained.

"(Here followed an argument between counsel and court as to the admissibility of this evidence.)

"Whereupon the presiding judge said: This testimony will be admitted in view of the fact that testimony along the same line was let in without objection on your part at all, and it might be deemed in the way of impeachment of former testimony.

"To which ruling and action of the court the plaintiff and each of them then and there duly excepted and still except.

"Q. What was the first thing done by Mr. Hughes when he came into your office? A. This kind of embarrasses me. I didn't intend for this to happen. This is all I know about it. He came in there Monday and took the telephone and called up and said, 'Is this Johnson & Lucas's office?' He said, 'I would like to speak to Judge Johnson.'

"Q. Who said that? A. Mr. Hughes. He said, 'This is Roland Hughes, Roland Hughes talking.' Then he said, 'Peltzer informs me that there has been no arrangement made in regard to my fee in this matter,' and he said, 'I would like to know about it.' Of course, ordinarily, I don't pay any attention to those things, but there had been so much of this in the newspapers that it just attracted my attention to that. Mr. Hughes listened and pretty soon said, 'All right,' and that is all I know about it. I told Mr. Hughes this morning that I had been subpoenaed. I wanted him to know about it. I told him what I would testify to. He said he had some recollection about saying something. He did not say he said it, he said he had no recollection of saying it, he admitted he came in there, and asked me what I remembered and I told him just what I have told here.

"Cross-examination by Mr. Hughes.

"Q. What did I tell you about it after you told me? A. You said you had no recollection about that.

"Q. No, what did I say about testifying to the conversation? A. You said, Go ahead; you said you didn't care. You said, 'All right.' I wanted you to know it before I got on the stand. I told Mr. Jacobs last night I wanted to see you first."

After witness Broaddus had testified, W. T. Johnson was called by plaintiff and testified as follows:

"My name is W. T. Johnson, I am an attorney for B. Clark Hyde, charged with murder, and have been since the beginning of the suit.

"Q. I will ask you whether or not Roland Hughes called you up on the 12th day of this month, last Monday, at your office in this city, and talked to you about his fee from Mr. Peltzer in this injunction suit? A. He did not.

"Q. He never said a word to you? A. No, sir.

"Q. Neither one way or the other? A. No, sir.

"Q. I will ask you if he didn't call you up and ask you about why he was to get his money from Peltzer? A. He never did.

"Q. Never at any time or on any occasion? A. No, sir.

"Q. Never said a single word to you? A. No, sir.

"Q. Did you ever discuss the fee with him at all? A. No, sir.

"Q. Did you ever have an automobile ride with him in which you discussed the fee with him? A. I did not."

Roland Hughes, attorney for plaintiff, did not testify after Broaddus gave the evidence hereinbefore quoted. However, Mr. Hughes was called by the plaintiff before Mr. Broaddus was sworn, and, when interrogated regarding any conversation he had had with W. T. Johnson (attorney for Hyde) about this suit, testified as follows:

"Q. Have you ever talked with Judge Johnson about this matter, J. M. Johnson? A. I don't think I ever did.

"Q. I mean W. T. Johnson? A. Yes, sir.

"Q. When did you talk to Mr. Johnson about the matter? A. Oh, I don't know. I expect it was last summer sometime.

"Q. When did you talk to him last? A. I don't know whether it was yesterday or the day before.

"Q. You know he is attorney for Dr. Hyde? A. I know he is so reported in the newspapers. . . . I think I was in the court room one day when that trial was going on. I do not think I have discussed with him the fact he was attorney or in any way connected with that matter.

"Q. Would you say you have not in any phase? A. You mean in connection with this suit?

"Q. Yes, sir. A. No, I don't think so. . . . .

"Q. Did you talk to him about Mr. Peltzer? A. No, sir.

"Q. Have you ever had any conversation with him about Mr. Peltzer? A. Well, I don't know, I think I have since this suit was brought.

"Q. When? A. I don't know. Since this suit was brought.

"Q. Where? A. Let me see if I can recall that. I don't know whether I met him on the sidewalk or called him up over the telephone. I called him up probably by telephone once.

"Q. Where were you? A. Probably in Judge Broaddus's office, because I have no telephone that connects with his office. He uses the Bell 'phone.

"Q. You haven't the Bell 'phone? A. No, sir. Judge Broaddus's office is probably 150 to 200 feet from my office on the same floor.

"Q. Do you use that Bell 'phone frequently? A. Not frequently, but occasionally.

"Q. Have you any distinct recollection of calling up Judge Johnson relative to this matter over the Bell 'phone in Judge Broaddus's office? A. It is not very distinct. I think I did, though.

"Q. Have you any recollection whatever of talking to him about Mr. Peltzer? A. I think so.

"Q. When was that? A. Well, that was probably—this is Friday, isn't it?

"Q. Yes. A. I wouldn't be positive about the day, but it was probably Monday or Tuesday evening after this suit was brought. I rode home with him in an automobile.

"Q. Have you a recollection now of that? A. Yes, sir.

"Q. And you have a recollection of a conversation relative to Mr. Peltzer? A. I think so.

"Q. Well, have you or not? A. What I mean is that while we rode home something was said about Mr. Peltzer.

"Q. What was that? A. I couldn't tell you now what was said.

"Q. Don't you know? A. No, I don't think I do.

"Q. I will ask you if you discussed with him at that time the question of your fee from Mr. Peltzer? A. No, sir.

"Q. Are you positive of that? A. I think I am positive that we did not discuss any question as to Mr. Peltzer.

"Q. I didn't ask you that; I asked you if you discussed the question of a fee from Mr. Peltzer with Judge Johnson in his automobile? A. That is what I understood the question to be. Judge Johnson, as I started home, came from his office, and his automobile was standing at the curb, and he invited me to ride home with him, and I did, and we talked about this case, and I don't know, it may have been in that conversation, I wouldn't be positive about it, that some-

thing was said about the fee, and I said to Mr. Johnson that whatever compensation came to me it would have to come from my clients. . . .

"Q. How did you come to be discussing this matter of your fee in this case with Judge Johnson? A. Oh, I don't know, just like lawyers riding along and talking about everything.

"Q. How did you come to talk to him about such a matter? A. I don't know. I couldn't tell you that. That is a psychological question. I can't answer that question. I am not an expert. . . .

"Q. Did the fact that Judge Johnson was an attorney for Hyde have anything to do with your discussion of that fee? A. I think not.

"Q. Will you say it did not? A. No, sir.

"Q. What would you say about it? A. I don't know what prompted the conversation in his mind. I couldn't say.

"Q. I am talking about your mind. You are the man that told him about the fee. A. About how that conversation came up?

"Q. Did he suggest the question of the fee, or did you? A. I don't know. . . .

"Q. I want to call your attention to a certain conversation and ask you if it transpired a few days ago, where you went in the office of Judge Broaddus, formerly judge of the Court of Appeals in this district, and took their Bell 'phone and called up the office of Johnson & Lucas? A. I think I told you I did that.

"Q. I will ask you whether or not when you got that number you asked for Judge Johnson to come to the phone? A. I don't know.

"Q. Will you say whether you did or did not? A. No, I won't.

"Q. You won't say you did and you won't say you didn't? A. I won't say that I didn't, and I don't have any recollection now of asking that question.

"Q. I will ask you if you finally did get Judge Johnson on the phone? A. I told you I thought I talked with him over that phone.

"Q. I will ask you if you made a statement of this character to him: That you were getting skittish about your fee from Peltzer? A. No, sir. I never used any such word as that to Judge Johnson or anybody else.

"Q. I will ask you if you said anything over that telephone to him relative to your fee from Peltzer? A. I don't know. If I did, it was something like this, that no arrangement had been made with Mr. Peltzer about my fee.

"Q. Why did you call Judge Johnson up and why did you say that to him over the telephone? A. I don't know. I have no distinct recollection now of why I said it.

"Q. Isn't it a fact that it was because he was the attorney for Hyde and because he was involved in the bringing of this injunction suit? A. Not at all.

"Q. You say that had nothing to do with it? A. He was not involved in the bringing of this injunction suit any more than you were."

Mr. Hughes further testifying stated that he could not recall having transacted any legal business with Mr. Peltzer before bringing this suit; that when Mr. Peltzer called he (Hughes) stated that he would be glad to bring the suit if Peltzer had some reputable taxpayers to join in it. That he had talked with plaintiff Bowling about the suit and knew Bowling's feelings in the matter. That he called Bowling over the phone and the latter consented to the suit being brought in the name of Peltzer and Bowling, whereupon the suit was instituted without any understanding with plaintiffs about paying any attorney's fee. That two days after the suit was brought plaintiff Peltzer called witness Hughes to his office, paid him $100 and asked

him what his fee would be, and witness replied that he (Peltzer) "could fix that to suit himself."

Mr. Bowling, one of the plaintiffs, testifying in his own behalf, gave evidence regarding the attorney's fee and expenses of this suit as follows:

"Q. When did you first talk with Mr. Peltzer relative to bringing this injunction suit? A. I have not talked with him at all. I haven't talked with him at any time or any place. . . .

"Q. Who have you talked to about this suit? A. Nobody. Mr. Hughes called me up over the phone to know if I would allow my name to be used in connection with Mr. Peltzer. . . .

"Q. Are you paying Mr. Hughes his fee for this injunction suit? A. No, sir. . . . I know Mr. Johnson, have known him a good many years. I knew his father. He has never discussed this matter with me. I do not know who is paying the expenses, attorneys' fees and costs in this proceeding. I don't know a syllable about that in any form or shape. I never heard anything about it at all. . . .

"Q. Haven't you a pretty clear recollection of what he said to you when he called you up and asked for the use of your name in this extraordinary proceeding?

"Mr. Hughes: Plaintiffs object on the ground that it is not an extraordinary proceeding. It is as common as a suit on a promissory note.

"The Presiding Judge: The objection will be overruled.

"To which ruling and action of the court the plaintiffs and each of them then and there duly excepted and still except.

"A. I think I am pretty clear as to what transpired between me and Mr. Hughes at the time he called me up and asked for the use of my name in this proceeding.

"Q. Well, then, did he say to you that you would not have to pay him an attorney's fee? A. No, sir.

"Q. Did you ask him if you would have to pay him an attorney's fee? A. No, sir.

"Q. Did he say anything to you about these costs devolving on you? A. I don't remember that he did.

"Q. Will you say that he did not? A. No, sir; I don't believe he did, though. I don't think I am quite clear on that, just what he said, if he said anything.

"Q. Do you expect to pay a dollar of costs in this case, if the costs devolve upon you to pay?

"Mr. Whitsett: We object to that.

"The Presiding Judge: Overruled.

"To which ruling and action of the court the plaintiffs and each of them then and there duly excepted and still except.

"A. I am not informed about that. I may . . .

"Q. Do you expect to be reimbursed in the event you have to pay costs? A. I would hope so; I don't know. I don't know where it would come from."

Further evidence of plaintiff Bowling is to the effect that he is a neighbor and friend of attorney Hughes, and has employed said Hughes in other litigation.

Plaintiff Peltzer, called as a witness by defendants, stated that, being of the opinion that the payment of the expenses in the Hyde case by Jackson county was illegal, he called upon attorney Cleary, whom he had frequently employed, and Cleary stated that he could not bring the suit to enjoin the county court because he was Mr. Hyde's attorney. He then asked Mr. Cleary about going to Hughes, and Cleary said "all right;" that he then went to Hughes, mainly because the latter had once been prosecuting attorney of Jackson county. Plaintiff Peltzer said that two days after this suit was brought he asked Hughes what his fee would be, and the latter said he thought that

$250 would be reasonable. Witness thought that amount "would be clear out of the road," but agreed generally to pay a reasonable fee.

Plaintiff Peltzer stated that he had no understanding with Mr. Cleary, Johnson & Lucas, or any other attorney for Hyde, about paying the costs of the suit; that he did not expect to get anything out of the case whether he won it or lost it. Witness was asked if he knew any reason why Mr. Hughes should call up Judge Johnson of the firm of Johnson & Lucas and ask him in relation to the attorney's fee in this case, and he replied that he did not.

## OPINION.

Does the foregoing constitute substantial evidence that this suit was not brought in good faith to prevent an unlawful disbursement of the public funds? Was it instituted or maintained to impede the prosecution of Hyde? If not prosecuted in the name of the real party in interest, or if the party or parties who caused it to be instituted are proceeding from improper motives, then the action of the trial court in dismissing their petition should be affirmed. As nearly all the evidence introduced bears upon this point, we have deemed it proper to consider that issue before approaching the more complex and difficult questions arising on the sufficiency of the petition to support the relief demanded. If plaintiffs are not the real parties in interest, or if the protection of their interests was not the chief purpose of the suit, then it will be unnecessary to consider the sufficiency of the petition.

*Injunction to Enjoin County Court from Paying Costs of Suit.*

The necessity of good faith on the part of plaintiffs in prosecuting an action in chancery is announced by Mr. High in his treatise on the law of Injunction (4 Ed.), vol. 2, sec. 1302, p. 1317, as follows:

*"Taxpayer must sue in good faith.* The general rule, as stated in the preceding sections, is also to be understood as limited to cases where the action is instituted by the taxpayer in good faith, and for the protection of his own interest. And where a taxpayer seeks to restrain an alleged waste or injury to the property of a city, equity will not extend him relief when it is shown that the action is not brought in good faith for the protection of his own interest, but that he is merely a colorable plaintiff, suing in behalf of other parties in interest."

In harmony with the views of Mr. High, it was held by the Supreme Court of New York in the case of Hull v. Ely, 2 Abb. New Cas. 440, that a taxpayer could not enjoin the sale of a ferry franchise owned by a city where it was shown that the principal purpose of the suit was to enable other parties, at whose instance the suit was instituted, to enjoy the benefits of the ferry franchise while it remained the property of the city. That action was one at law which authorized injunctive relief to a taxpayer in a suit to stay waste by the city, but the court ruled that plaintiff was not entitled to relief either at law or equity.

The last-quoted decision was approved in Kimball v. Hewitt, 17 N. Y. St. Rep. 743, l. c. 745, where it was appropriately said by VAN HOESEN, J., that "in all applications of this character it is the duty of the court to see to it that he who undertakes to champion the public cause is actuated by public motives, and that he is not making use of the power of the court to accomplish some private end."

While approving, in a general way, the doctrine of these cases, it is not necessary for us to take the extreme ground which they announce. Those actions were on a right expressly given by a statute, but the suit at bar rests only on equitable principles, and the doctrine that one who demands this extraordinary writ must come with clean hands and proceed from honest

motives to protect his own interests applies with spe-cial force. Following the rule announced by High, we hold that, if the chief purpose of this suit was to im-pede the prosecution of Hyde, the judgment should be affirmed.

Coming back to the facts of this case, it appears that plaintiff Bowling had paid sixty-one cents into the public treasury of Jackson county, and might be injured a few cents by the alleged misappropriation of part of the public funds. He only became a party plaintiff at the request of attorney Hughes for the ostensible purpose of giving the cause a better ap-pearance; it being the expressed desire of the latter that several taxpayers should join Peltzer in the ac-tion. We think, under the admitted facts, that Mr. Bowling's interest in this suit may safely drop out of view altogether.

Mr. Peltzer, the principal plaintiff, has testified quite positively that he alone is responsible for this action and the attorney's fees for prosecuting same; but notwithstanding its unequivocal character his tes-timony is not convincing.

A taxpayer injured only to the extent of a few dollars or a few cents, and desiring to bring an action of this character, is a man who usually counts the cost of every outlay and expends no more money on anything than is necessary. According to Mr. Pelt-zer's testimony he was very desirous to know just what Mr. Hughes's fee would be, and according to the testi-mony of Mr. Hughes there were many people who thought this action ought to be brought—hundreds perhaps. Yet Mr. Peltzer does not seem to have in-vited anyone to join him and bear part of the burden of the action. On the contrary, like Don Quixote, he rushed single-handed to the relief of the supposed victim (in this case the public treasury). This con-duct is so out of the ordinary as to cast much discredit on the evidence and motives of Mr. Peltzer.

While attorney Hughes had a perfect right to bring and prosecute the action for Mr. Peltzer, the undenied and unexplained evidence of Mr. Broaddus, who seems to be about the only disinterested witness in the case, points quite strongly to the fact that Mr. Hughes depended upon the firm of Johnson & Lucas (Hyde's attorneys) to pay or look after the payment of his fee. Peltzer testifies that he knows no reason why Hughes should call Johnson & Lucas in regard to his (Hughes's) fee in this case. Johnson swears unequivocally that he never at any time talked with Hughes about the attorney's fee in this cause. On the other hand Hughes admits the conversation at the time referred to by Mr. Broaddus, but, when interrogated about the matter, Mr. Hughes tries to minimize its importance by forgetting what was said.

This suit was instituted on January 10, 1914; the conversation which Broaddus heard between Hughes and somebody took place on January 12th, and the cause was tried on January 17, 1914, just seven days after it was filed. It is surprising, indeed, that Mr. Hughes should forget so many things within such a short time.

Peltzer says that two days after the suit was filed Hughes wanted an attorney's fee of $250, while Hughes states that when asked what his fee would be he told Peltzer to "fix that to suit himself." Mr. Hughes seems to have forgotten most everything which moved him to bring and prosecute this action. Upon the whole case, as charitable a view as we are warranted in taking of his evidence is that some one interested in the defense of Hyde instigated or employed him to institute this action, and the fact of such employment has simply fallen out of his memory. At any event, he seems never to have voluntarily asked any one about his fee, except someone in the office of Johnson & Lucas (attorneys for Hyde).

The testimony of Judge Johnson regarding the telephone communication had within the hearing of Broaddus may be correct. Broaddus could not tell with whom the conversation was conducted—he only knows that Hughes called for Judge Johnson of the firm of Johnson & Lucas, with the avowed purpose of finding out about his fee in the Peltzer matter. It may be that some other representative of B. Clark Hyde in that office replied, agreeing to pay Mr. Hughes's fee, and that such agreement caused Mr. Hughes to terminate the conversation by the words, "All right." Peltzer says he knows no reason why Hughes should call Johnson & Lucas for information about his fee in this case. The only natural inference is that someone connected with the office of Johnson & Lucas agreed in that conversation to pay Mr. Hughes's fee.

The writ of injunction is not a writ of right, but a writ of grace and discretion, and should only be issued when the chancellor is convinced that a proper case has been made. [Johnson v. Railroad, 227 Mo. 423, l. c. 450.] The application for this writ cannot appropriately be compared to a suit upon a promissory note, as appellants' learned attorney seems to think. Not only should everyone who applies for this extraordinary writ come into court with clean hands and honest motives, but his motives being a matter peculiarly within his own knowledge, and, when, as here, defendant's good faith is challenged, he should be able to furnish convincing evidence that the action is not maintained primarily to promote some improper purpose.

A careful and painstaking review of the record convinces us that the trial court possessed very substantial evidence that the bringing of this action was primarily for the purpose of impeding the prosecution of B. Clark Hyde, and that the alleged illegal dis-

bursement of public funds was only an unimportant factor in causing the action to be instituted.

The judgment of the trial court dismissing plaintiffs' bill should be affirmed.

*Graves* and *Bond, JJ.,* concur in the views expressed in this opinion. However, a majority of the court not concurring the judgment of the circuit court is reversed and the cause remanded by an opinion *per curiam.*

## CONCURRING OPINION.

GRAVES, J.—I fully concur with the views of our brother BROWN in this case. This record cannot be fairly read without reaching the conclusion that the plaintiffs in this suit in equity are but the "stool pigeons" of B. Clark Hyde, the defendant in the case of the State of Missouri v. B. Clark Hyde. And further that the suit was not brought in good faith for the purpose of protecting the public funds of Jackson county, but was covinously brought to prevent the trial of one charged with a most heinous crime, i. e., murder by the cold and premeditated method of poisoning.

In this case it must not be forgotten that these plaintiffs have appealed to a court of conscience, not a court of law. In such court their own conscience can be "sifted" and if there be "dross" therein, they should be refused that relief which can only come from a court of conscience. They should come not only with clean hands, as the ancient rule reads, but they must come with an open breast and explain honestly to such court of conscience their appeal to it for relief. They cannot aver one alleged reason (even though it be well founded in law) for asking relief and hide from such court the real moving reason for their suit, and ask the court, which they thus seek to deceive, to give them relief in equity. Grant it that if as honest and honorable taxpayers they were seeking to protect

a public fund they should have relief in equity, yet when it is made to appear that such is not the real purpose, but the real purpose is a venal and corrupt one, a court of equity should wash its hands of such a cause at the first open door. This the chancellor *nisi* did, and his judgment should be affirmed. If the public treasury is about to be looted, as plaintiff's counsel insist, there are no doubt good citizens enough in the county who will look after the county's welfare, with that sole purpose in view, and who will not pay their counsel from the funds of another, which other has more interests in this suit than the plaintiffs herein. This is one of the most typical causes calling for a prompt dismissal of the bill by a court of conscience. Courts of equity should not be trifled with by parties plaintiff having the motives shown in the instant case. The sacred field of equity should not be open to such parties. They should be met at the threshold and have the beauties and grandeur of equitable jurisprudence explained to them, and be there reminded that he who would darken the portals of equity must not only enter with clean hands, but must come with an honest heart and an open countenance—that nothing should be hid from the eye or the ear of the chancellor. Equity despises deceit and fraud and will not countenance it. Hiding the real purpose of a suit is an abomination in the eyes of equity and deserves to be condemned. The chancellor *nisi* did so. Let his righteous and equitable judgment prevail. *Bond, J.,* concurs in these views.

## DISSENTING OPINION.

LAMM, C. J.—I do not agree with the principal opinion in so far as it seemingly stresses the fact that plaintiffs are small taxpayers, and that their proportionate share of the alleged illegal appropriation of the public funds would amount to little in dollars and

cents. I take it that the maxim· *de minimis* should have little or no weight in the grave courts of serious minded people ·when a taxpayer asks for relief by injunction against a maladministration of .public funds. Otherwise, it would be only the affluent who could invoke equity in that behalf. As was said by another, the value of this observation lies in the application. of it. In these times ·where there is a studied attempt to draw class distinction and where there is yeasty unrest on that score in the public mind, courts can do no better public service than by showing in their judgment that such pestiferous notions find no lodgment in law or equity. I think equity lends a respectful ear to the protest of one or two small taxpayers who stand sponsor in a given case for the establishment of a clear equitable principle in the administration of public funds. However, it seems from the record that plaintiffs are substantial taxpayers.

I agree with zest in the general doctrine announced in the opinion of my brother BROWN and in the concurring ·of my brother GRAVES, viz: that before a court of conscience acts its own conscience must be moved. Hence a litigant who comes with unclean hands has no redress in such court. I stand wedded to that doctrine, though it must be accepted as a *general* precept that when A sues B at law or equity the real justiciable question is not what were A's motives in bringing the suit, is not whether A's psychological condition is unethical. *Contra,* generally the real justiciable questions are, is A wrongfully injured by B, are A's legal or equitable rights violated by B in the matters complained of? Now in the case at bar a main question was put to us, to-wit:· Is there any warrant of law for the appropriation in aid of a criminal prosecution pending of $15,000, by the county court of Jackson county, out of public money raised *in invitum* for specified public purposes by means of the sovereign power of taxation? The learned principal opinion has a sig-

nificant omission, to-wit, a decision of the main question. So prominent is this omission that I infer my learned brother means to say, and by necessary implication does say, that an affirmative answer is out of the question and cannot be given. I read the principal and concurring opinions as a concession that such extraordinary appropriation runs counter to the written law, and to the theory of criminal costs and liability therefor hitherto entertained by courts of this commonwealth, as well as by the lawmaker and those charged with administrative duties. Therefore a doctrine, that I concede to be the handmaiden of equity, is brought into play to break the case, to-wit, the doctrine (metaphorically speaking) of "unclean hands." If, now, the case is to break on that sole question we should be sure of our ground. The premises from which that conclusion is to flow should be sound premises. If this case is in deed and truth a covinously contrived case, wherein a prisoner charged under the solemn form and sanction of the law with the commission of crime is the real actor, in an attempt through a court of conscience to prevent his own prosecution or escape the penalty that would follow his conviction, then, the case stands precisely as if he is the real party in interest and is suing in his own name; for equity looks to substance, not to form. The discriminating and piercing eye of the chancellor looks inside the shell of the nut of the suit to the kernel itself, and his hand would remain passive. The trouble in the case to my mind is that plaintiffs, unless cast on the doctrine of unclean hands, have a clear right to an injunction. If the county court of Jackson county proposes in the name of all the taxpayers to use a common fund raised by taxation as a reward, or, putting it softly, in payment of witnesses to aid in the prosecution, then I have nothing to say about the wisdom or unwisdom of that course, but I do say this: There should first have been appropriate legislation in

the form of a general law that applies to every county in the State permitting such extraordinary expenditures—expenditures that are confessedly outside of all legal warrant. We shall recur to the facts presently.

It was argued with vehement animation at our bar that the "people" demanded the appropriation— that (as we gather it) the *people* were watching with eager and suspicious eyes first to spy out and then mark with condemnation any effort to thwart their will in that behalf and so on and so on. As to that view of it, should not this court be serene, steady and courageous enough to point with inflexible finger to the law? Peradventure *law* is the flag we should follow. This court is organized to subserve the wish and will of the people expressed how? Expressed through the form of the law, not the alleged wish and will of the people or the alleged voice of the people conveyed to us by extraneous means with the heat and blaze of oratory or flights of rhetoric. Observe, too, that this case does not involve the payment of private funds of individuals to aid a prosecution. Such payments are not to be interfered with. *Contra,* this case is levelled at an admittedly (I use the word advisedly as the sum of the matter) illegal use of common funds raised from all the people and reposing in the common money chest and protected by every safeguard the wit of the lawmaker could devise.

Returning to the question of unclean hands, I think these observations just: Conceding, as I do, that if this case is brought or prosecuted by one charged with a crime either in his own name or by him masquerading under the name of another, an injunction should not issue, we come to the testimony on which the principal opinion rests. I have read it and reread it and am unable to concur in the opinion that it satisfactorily establishes collusion between such defendant in a criminal case and the plaintiffs in the injunction case. That

260 Mo.—34

there is some testimony creating a suspicion of that sort, I admit; but if we are to adhere to the ancient rule that ignoble purposes and ignoble things are not to be presumed or established by suspicion or mere conjecture, but are to rest, if at all, on substantial basis of fact, and if we are to apply the lofty doctrine of the law that where fraud and dole are charged, and where two views of testimony to sustain the charge may rest in reason, one ignoble, the other not, the court is bound to take the nobler view, then I see no escape from the conclusion that collusion, fraud and dole were not made out. The burden, I think, rested on defendants to show a case of that sort, and this burden they did not well carry. No attempt to impeach the honor or verity of the witnesses was made. Their disavowal of the payment of fees by the defendant in the criminal case should not be lightly disregarded and I rest my vote on that proposition. Therefore I dissent.

*Faris, J.*, concurs with me in these views.

## DISSENTING OPINION.

WOODSON, J.—With all due deference to my learned associates, it is just such opinions as this, delivered by the highest court of the State, which lend countenance to the illegal expenditure of public money and suggest the idea, so prevalent, that there is no security for public funds.

The various opinions frankly admit, which is a fact, as is known by all courts and lawyers, that there is no law authorizing the county court of Jackson county to pay this $15,000, in the prosecution of a felony case, but upon the contrary, the law explicitly and clearly provides all such cost shall be paid by the State. Why then, did counsel for the State go to the county court of Jackson county, instead of to the county court of Buchanan county or Clay county, and

ask them to make the appropriation. All concede that
they or any other county in the State would have just
as much legal right to make the appropriation as Jack-
son county has; but by reading and a careful consider-
ation of the briefs of counsel for the respondents it
will be clearly seen, that this legal proposition, which
is as plain as the noonday sun, has been brushed aside
as so much chaff, and so deeply buried beneath a heap
of worthless rubbish regarding the good faith of the
relators who brought this suit (although they are *bona
fide* taxpayers of Jackson county, and unquestionably
have the legal right to object to its illegal expenditures,
and to be heard in the courts of this State upon the
legality thereof) that the real legal proposition in-
volved has been lost sight of and has caused my learned
associates to unwittingly follow the false gods, and to
pass by the legal proposition presented unnoticed and
undecided.

I had an occasion to go quite extensively into this
question in the case of State ex rel. v. Williams, 232
Mo. 56. There the question was, whether a ministe-
rial officer, as such, could resist the payment of a war-
rant because issued under a statute he contended was
unconstitutional. We there held that in the absence of
the advice of the legal department of the State he could
not so do, he as such officer had no right to involve the
county in litigation where he had no other interest
in the funds ordered paid; but that case falls far short
of this where a taxpayer, as such, who has an interest
in and the right to see that the revenues of the county
are not squandered, not under an unconstitutional stat-
ute, but without any legal authority whatever. This
court has repeatedly held that while a ministerial offi-
cer cannot question the constitutionality of a statute,
yet a taxpayer may do so; and our reports are full of
such cases. The Supreme Court of the United States
has also so ruled in many cases, notably in the Kansas
tree-planting cases, and in cases involving taxes levied

to support gristmills in remote and sparsely settled districts. But in the case at bar there is no statute or other law authorizing this expenditure, and *a fortiori* should the taxpayers in this case be permitted to maintain this suit, when no law on earth authorizes the expenditure of this $15,000 for the purposes mentioned, and which, if done, would clearly render the county treasurer of Jackson county and his bondsmen liable therefor, if not the county court itself, as much so as if he or they should take the money and pay it to assist in the prosecution of some felony in the State of Kansas.

This species of litigation, under the circumstances, is the only safeguard against such usurpation of authority, the illegal expenditure of public money on the part of those public agents who are entrusted with the custody and expenditures thereof. Moreover, it is just such cases as this which encourage peculation and fraud in public office. If this court will tolerate such a bare-faced illegal expenditure of the public moneys as is here attempted by evading the question, on a question of procedure, then in the name of heaven why should we condemn the poor officers who are ignorant of the law for doing likewise in other cases?

With far greater plausibility and better taste, at least, the legal department of Jackson county might have mandamused the State Auditor, and the State Treasurer, to set aside this $15,000 for the purpose of paying the fees of expert witnesses in that case, for the reason that the State and not the county is primarily, nor secondarily, responsible for any of the legitimate fees taxable in felony cases. But do not understand me by this language to state or indicate that the State, even under any circumstances, would be liable for such expert fees, over and beyond the fees prescribed by statute, for the truth is, as all lawyers and courts know, that there is not a word or line to be found in the common law or the statutes of this State, which

in the remotest degree intimates, much less authorizes, either the State or a county to pay *expert witnesses fees of any character*. The laws recognize no difference in the character of witnesses, in so far as their fees are concerned, and should either the State or county officials undertake to expend or expend public moneys for expert witnesses, beyond the sum fixed by statutes, they would so do right in the teeth of the statutes of this State, and thereby violate the law they are sworn to support. Besides, it is elementary that costs of no kind can be legally taxed in any case, civil or criminal, for or against the State or county or an individual, without the taxing clerk can point his finger directly to the statute which expressly authorizes him to so do.

Will any of my learned associates point his finger to a law or statute that authorizes this $15,000 to be paid to expert witnesses, either by State or county, or by the defendant, should he be convicted? And if convicted, and if this requested appropriation is legal, would it be contended for a moment, under the statutes of this State, that Dr. Hyde would be liable to the State for its repayment, as legitimate fees taxable against him? Certainly not. But suppose he should be convicted and this $15,000 should be taxed against him, and execution should issue therefor, would this or any other court hesitate a moment in holding that the taxation of that money against him was unlawful, that he was not responsible for the same, and that the execution should be quashed? Certainly not. And no one will contend to the contrary.

There is another phase of this case, which in my opinion is worthy of serious consideration, and that is this: Suppose for the sake of argument, that Dr. Hyde is guilty of all the matters charged against him by indictment, which is nothing more or less (in so far as this case is concerned) than a violation of the laws of the State, and he should be found guilty of the same,

yet does his violation of the law of God and man justify or authorize the county court of Jackson county or the treasurer thereof to also violate the laws of the State in order to assist in the prosecution of a wrongdoer? I think not. The act of the one is just as clearly a *breach of the law as the other*—differing only in degree—not in principle. This is self-evident, and has become a truism expressed in the words "two wrongs can never make a right."

Moreover, what great Herculean Master is the man Hyde, any way, that the great State of Missouri, with her millions of patriotic sons and dutiful daughters and her billions of treasure, cannot grapple with him and bring him to justice without resorting to illegal means to accomplish that purpose? The mere asking the question answers it—there is no substance in the proposition.

Besides that, I have no patience with those persons (who I am glad to say are few, and who are growing fewer every year) who believe that the doctors, surgeons, chemists and lawyers of Kansas City and the State of Missouri have not the same intelligence, learning and professional ability and skill as those of other States.

I have always been impressed with the idea, that if this great Commonwealth is capable of self-government, then it surely has the ability to administer its criminal and civil laws without calling upon outsiders for assistance, and that if that is not true, then I suggest that it is about time to adopt some other form of government. I am firmly of the opinion, as previously indicated, that the citizens of this State have the intellectuality, ability and experience to govern, and control, each and every department of this State without calling for outside assistance.

My observation and experience have been, especially regarding the legal profession, and in no small degree that of the medical, that a comparison of the

members of those professions with those of other States, and of the United States, would not bring a single blush of shame to any intelligent man or woman in this State. These general observations are so thoroughly true and in harmony with the general knowledge of men and measures, it seems to me that it is a grave reflection upon the good people of Kansas City and the State of Missouri, with all of her institutions of learning, intelligence, culture and wealth, to even suggest that there is not sufficient scientific knowledge and experience in this State to determine whether or not a certain person died of natural causes or from poison, or through other unnatural means.

This idea that the man over the hill has a farm better than any on this side, and that the lawyers and doctors in other States are more intellectual and learned than those of this State, has erroneously led many to believe that their next door neighbors are ignoramuses, if not wild and uncivilized Commanches, not worthy of consultation or respect. If counsel for the State will disabuse his mind of this fallacy, and proceed to try Dr. Hyde under the laws of this State and with the assistance of such witnesses as the law authorizes him to procure, he will find that his duty has been fully discharged, and that justice has been duly administered according to law and that the good people of Kansas City will be fully satisfied with the result—whatever that may be, even though the courts of the country will not permit him to resort to illegal means to procure outside assistance.

I do not know, nor do I care, what the financial condition of Dr. Hyde is, so far as this case is concerned, yet, I am impressed with the idea that this great State should be satisfied with a prosecution of him, according to the laws thereof, without resorting to illegal means; and moreover, the presumption is, that the State is as able financially to try this case without outside assistance, as Dr. Hyde is to defend

himself of the charges lodged against him.. To me this request for $15,000 to be used in the prosecution of the defendant smacks of persecution instead of prosecution, and by this language I mean no reflection whatever upon our able and efficient prosecutor, because I believe he, as I have frequently done, has let his zeal in what he believes to be a righteous cause, run away with his better judgment, but that is no legal reason why he or I should be sustained in doing those things which are not authorized by the law.

Regarding Dr. Hyde's guilt or innocence, I have no opinion, nor am I acquainted with him, yet the Constitution of this State guarantees unto him a fair and impartial trial, according to the laws of the State; and I take the law to mean, that he shall have a fair and impartial trial according to the laws of the State, and be prosecuted in the manner, and by the means prescribed by the Code of Criminal Procedure, and not by means furnished by other public bodies.    Literally speaking this language might prohibit the employment of counsel to assist in the prosecution of a felony case, which I believe would be wise, but I do not believe the Legislature so designed, yet I am firmly of the opinion that the Legislature never contemplated or intended that the county court of any county of this State should illegally or otherwise appropriate funds to prosecute Dr. Hyde or any other person charged with a felony.

Who is going to audit the account upon which this money is to be paid out? Not the State Auditor, who has the exclusive authority under the laws to so do in all such cases, subject of course to the review of the courts.    But this illegal expenditure of public money can never come before the courts of this State without the treasurer of Jackson county should refuse to pay the same, which if done, would of course be at his risk, and in such case I apprehend the question of his misappropriation of that money will in some form reach this court for adjudication.

Under the conceded law, this expenditure of this $15,000 would be illegal; and I believe it would be wise to so state in this case and thereby avoid all further litigation regarding the matter; and obviate the risk of some innocent person having the burden to bear in the near future.

I, therefore, dissent from the entire expressions of the court and the various judges thereof, except I believe the judgment should be reversed.

## DISSENTING OPINION.

WALKER, J.—Upon a careful examination of the question here involved I find that I cannot concur in the conclusion reached in the majority opinion, which, in not expressly determining the question submitted, gives tacit approval to the appropriation and apportionment of $15,000 of the funds of Jackson county by its county court for the proposed purpose of defraying the estimated expenses of conducting a criminal trial therein.

The powers of a county as a subdivision of the State are clearly defined and limited by law, and its administrative agents, the members of the county court, have no authority except that clearly conferred by law.

The proposed appropriation being foreign to the purposes for which counties are created and beyond the powers of the county court, upon the matter being brought to our attention it becomes our duty to determine beyond a peradventure whether the appropriation is authorized.

Certain citizens of Jackson county, represented by an attorney who is an officer of this court, submit this question for our determination, and while circumstances may appear which give credence to the conclusion that counsel for the defendant in the case in which this appropriation is proposed to be made, seem to have had a shadowy connection with the matter,

this should not, and so far as I am concerned will not, prevent an affirmative expression of opinion as to whether this proposed use of county funds is supported by the statute.

It is almost too elementary to justify reference thereto that a criminal prosecution is one in which the State is primarily interested, and with which a county, unless expressly empowered, has nothing to do; not only the Constitution, but the entire Code of Criminal Procedure, proves the correctness of this conclusion, and the supplemental or adjective law in relation thereto defining the manner in which criminal costs must be determined and paid, is additional proof that it is the State, and not its subdivisions, which is charged with criminal prosecutions, and the expenses incident to same; but I "harp upon a mouldered string" as this truth is too well established to need elaboration.

As to whether the case in which this appropriation is proposed to be made is one in which more than ordinary expenses should be incurred, is a matter which should not concern us in passing upon the question as to the power of the county court in the premises. If by our inaction this question having been submitted to us, we tacitly sanction this appropriation when the same is not authorized by law, we open the way by judicial legislation for inroads upon county treasuries which cannot prove otherwise than wasteful and vicious.

I am, therefore, unqualifiedly of the opinion that the writ of injunction herein should be granted, that in so doing the court may place the seal of its disapproval upon this attempted misuse of county funds.

PER CURIAM.—As indicated by the several opinions filed herein, it appears that five of our number are in accord with the proposition that if the suit was collusively instituted by the plaintiffs in the interest of the defense of Dr. Hyde in the criminal case, the

trial court was right in dismissing the plaintiffs' bill. It also appears that three of that five are of opinion that the evidence in the present record shows such collusive action, while two of such five do not think the facts of the present record show such collusive action. In addition it would appear that two of our number dissent from the general doctrine herein above first stated. In this state of opinion we were unable to reach a judgment, but to the end that a judgment may be reached, those of us who are of the opinion that if the suit was collusively brought the bill should be dismissed, agree (without changing our views as to the sufficiency or insufficiency of the evidence in the present record, to show a collusive action in the institution and prosecution of the suit) that the judgment *nisi* shall be reversed and the cause remanded for a new trial, so that the facts as to the collusive character of the action may be more fully investigated.

Let the judgment *nisi* be reversed and the cause remanded. All concur, except *Woodson* and *Walker, JJ.,* who dissent.