CARLTON R. BENTON, Administrator with the will annexed of the Estate of W. H. DAVIS, Deceased; JOSEPH COBB, an individual, and FLORENCE LILLIAN CRAWFORD and ALLAN M. FISHER, Trustees, Plaintiffs-Appellants, v. ALCAZAR HOTEL COMPANY, a Corporation, Defendant-Appellant, MILNER HOTELS, INC., a Corporation, Defendant-Respondent.—Nos. 38778, 38779.—180 S. W. (2d) 33.

Division One, April 3, 1944.

Rehearing Denied May 2, 1944.

*Allan M. Fisher, H. M. Langworthy* and *Raines, Glenn & Garling-house* for appellants.

*Joe Levin* and *Chas. N. Sadler* for defendant Alcazar Hotel Company, appellant in No. 38779 and respondent in No. 38778.

*Roy P. Swanson* and *Edward S. Biggar* for Milner Hotels, Inc., respondent; *Michael, Blackmar, Newkirk, Eager & Swanson* of counsel.

DALTON, C.—Action under the declaratory judgment act to construe provisions of a lease, to determine whether the provisions have been breached or the lease cancelled, to establish the validity of a contract for the sale of the leased property and to fix and finally determine

the rights and liabilities of the parties under the lease and the contract of sale. The court dismissed plaintiff's petition and a cross petition by a defendant (vendee) seeking relief against plaintiffs. The court further found that the lease was valid, subsisting, unbreached and uncancelled; that the contract of sale was not bona fide; and that the vendee had no rights thereunder or any interest in the described property. Plaintiffs and one defendant (the vendee) have appealed. The appeals have been consolidated.

There is little dispute concerning the facts. On and before October 1, 1942, W. H. Davis and Josephine Cobb, both of Topeka, Kansas, were the owners and lessors of described real estate in Kansas City, Missouri, upon which was located a 186 room, six story hotel building, known as the Reid Hotel (formerly the Coates Hotel). The real estate, building, furniture and fixtures were subject to a ten year lease to Milner Hotels, Inc. (hereinafter referred to as Milner), dated November 1, 1937. The lease provided for a monthly rental of $833.33 per month, and contained the following provision: "It is further agreed and understood that said lease shall be subject to a cancellation clause after the first five (5) years of said lease, providing, however, that the first parties have a bona fide offer for a purchase of the above property. In that event, first parties shall give written notice to second party of such offer to purchase, and second party shall have the prior right to purchase the property at the price named in said offer. Should second party elect not to purchase the property, it shall receive ninety (90) days' notice upon the completion of sale to other parties, and shall receive as liquidated damages ninety (90) days' free rent of the premises."

In the year 1941, the taxes, insurance, repairs and expense (exclusive of depreciation) exceeded the income from rents by $1636.48 and the owners decided to offer the property for sale. John E. Kirk, an attorney, was given an exclusive agency contract, which was renewed from time to time. The contract of September 15, 1942 (expiring November 15, 1942) provided minimum terms, as follows: "$10,000 cash down; 4% interest on deferred balances, payable semi-annually; 5% of the principal to be paid at least semi-annually; purchaser to pay 1943 taxes and thereafter and to maintain insurance in ample amounts and make all repairs. Said John E. Kirk shall be entitled to such part of the down payment as it shall be in excess of the net prices to us herein agreed upon, to wit; $100,000 to others than Milners, and $97,500 to Milners, with which to pay commissions, expenses, and his compensation for making the sale."

Kirk and an associate thereafter contacted the Alcazar Hotel Company (hereinafter referred to as Alcazar) and arranged terms for a sale. Some investigation was made concerning Alcazar and it was learned that it had purchased two pieces of property from insurance companies; that the companies had taken mortgages for

balances; and that in one of these deals a $45,000 check had cleared. Kirk recommended a sale and the owners entered into a contract with Alcazar for the sale of the leased property for $110,000. The contract, dated October 3, 1942, was "subject to option in existing lease with Milner" and provided for a $10,000 down payment ($2000 on signing of the contract, $8000 more within five days after notice that Milner "has failed to exercise their option to buy said property at the same price and terms as offered and agreed herein"), with $5000 on principal annually and 4% interest payable semi-annually on deferred balance. Possession was to be delivered on February 15, 1943. Provision was made for delivering deed with a deed of trust back, after 40% of purchase price was paid. The contract of sale, a warranty deed in due form, a copy of lease to Milner, with inventory of fixtures and equipment attached, and a check for $2000 was placed in escrow with the Commerce Trust Company on October 15, 1943. Thereafter, Alcazar was notified that Milner had failed to exercise its option and, on December 26, 1942, Alcazar paid the $8000 additional to the Commerce Trust Company. The total of $10,000 was thereupon paid out to Kirk and an associate, as commissions and expense, in accordance with the written directions to the Commerce Trust Company, dated October 8, 1942.

Prior to the sale to Alcazar, Kirk had contacted Milner and he thereafter received a letter from Milner, dated October 10, 1942, advising that Milner would be interested in buying the property, except that it had "used up all the money in the Missouri Corporation that would buy this hotel." On the same date, Kirk, as agent for the owners, advised Milner that the property had been sold to Alcazar for $110,000; that the contract had been signed, the down payment made and the deed placed in escrow, but that Milner, under its lease, had the prior right to purchase at the price named in the offer.

On October 12, 1942, W. H. Davis died testate, but all interested persons are parties to this proceeding. On October 30, 1942, the W. H. Davis Estate and Josephine Cobb notified Milner regarding the contract with Alcazar, in part as follows: "We hereby notify you that we have a bona fide offer for the sale of said property to The Alcazar Hotel Corp., of Kansas City, Missouri, for the sum of One Hundred Ten ($110,000) Thousand Dollars on the following terms: $10,000 down payment; $5000 principal payment annually; 4% interest, payable semi-annually. Purchasers agree to maintain $50,000 of fire and windstorm insurance on buildings at their own expense, and to pay 1943 taxes and taxes for subsequent years. Deed and contract with check are in escrow with the Commerce Trust Company of Kansas City, Missouri. According to the terms of said lease your corporation has a prior right to purchase the hotel property at the price named in said offer. We must, of course, know whether your corporation desires to exercise its option and purchase said prop-

erty, so we could appreciate having your decision as to your election at once. Failing to hear from you within ten days or by November 10, 1942, we will take your failure to respond as notice that you do not desire to purchase said property at said price, and will go ahead with the sale and will, of course, require possession in accordance with the terms of said lease.'' (The first five (5) years of said lease'' expired October 31, 1942.)

On November 6, 1942, Milner replied, in part as follows: ''Without in any manner admitting the bona fiders (sic) of the offer nor the legality of the notice sent us, we wish to advise you that we are willing to purchase the said hotel and site for the amount of the offer you claim to have received, that is the sum of $110,000 and that we will be glad to discuss the terms and conditions of sale with you at any time.''

On November 13, 1942, Kirk advised Milner that ''the price and terms have already been set, and the people are anxious to buy.'' Milner then sent a fully authorized representative to Kansas City for a conference with representatives of the owners of the property. In the meantime, Milner made a preliminary investigation concerning the corporate structure and financial responsibility of Alcazar. At the conference, held on November 18, 1942, Milner's representative contended the offer of Alcazar was not bona fide. Subject to this objection, Milner made a counter proposal to buy the property on specified terms, but the proposal was rejected. On November 23, 1942, the same proposal was submitted by wire, in part as follows: ''We are willing in accordance with the terms of our lease if Alcazar Hotel Company offer is bona fide to renew our offer to purchase Reid Hotel, formerly Coates Hotel, property at the price of $110,000 and for cash payments named in the agreement for warranty deed signed by Alcazar . . . provided we are given fifteen days written notice in the event of any default claim and also that our liability in the event of default is limited to payments made and return of property as discussed in Mr. Swanson's office last Wednesday.''

On November 24, 1942, this counter proposal was rejected by wire as follows: ''Our conclusion your offer with limitations does not meet terms of lease or bona fide offer obtained.'' On November 25, 1942, Milner demanded that the owners accept its offer and close with it. On January 7, 1943, Milner was notified that, in view of failure to purchase at price named in Alcazar's offer, the sale with Alcazar had been completed and it (Milner) must vacate the property in 90 days, as provided by the lease. Milner replied January 22, 1943, that it did not recognize Alcazar as purchaser. Rent checks, tendered to plaintiffs by Milner, were rejected.

The evidence offered in support of Milner's contention, that the offer of Alcazar was not a bona fide offer, was that Alcazar was a Missouri corporation organized February 18, 1942; that it had

an authorized, paid-up and issued capital stock of $2000; that Solomon E. Harrison and wife owned its stock and controlled the corporation; that the corporation had no assets, except the $2000; that it had no current or delinquent liabilities; that it had no bank account or tangible assets; that during the year following its incorporation, it had purchased eight pieces of real estate in Kansas City (chiefly hotels) upon which the total cash down payments had exceeded $147,000; and that it had executed mortgages or deeds of trust to secure obligations for unpaid balances in excess of $877,000. There was no evidence that any of these obligations were not adequately secured by real estate security. No defaults had occurred. The obligations had been accepted by such companies as the General American Life Insurance Company, the Lincoln National Life Insurance Company, the Guardian Life Insurance Company and others. All properties had subsequently been conveyed, subject to encumbrances, to persons who held title for certain Chicago investors. One of Mr. Harrison's associates, a Mr. Graff, advanced to Alcazar the $10,000 for the down payment on the property in question. Mr. Graff testified on behalf of Milner that it was his intention to take the property over for himself and his clients; that he was buying the property; and that he intended to go ahead and carry out the contract. There was evidence that, prior to the sale, vendors knew little or none of the facts shown in evidence with reference to financial condition and corporate structure of Alcazar.

Appellants attack particularly the provisions of the decree that "the defendant, Alcazar Hotel Company has not made a bona fide offer nor entered into a bona fide contract and has no contract to purchase said premises and personal property, and has no right, title or interest in or to said premises and personal property"; and that defendant, Milner Hotels, Inc., has not breached the terms of its lease and is entitled to remain in possession of the described premises and property, as lessees, under the lease of November 1, 1937.

██ Respondent (Milner) seeks to support the decree on the theory (1) that the alleged offer of Alcazar was not a bona fide offer for the purchase of the property; (2) that Milner met the offer under the terms of the lease; and (3) that the decree was for the right party and should be affirmed. The primary issue submitted is whether the lessors had "a bona fide offer for a purchase of" the real and personal property described in the lease. Respondent contends that it could not be put to an election to buy the property at the price named in the offer or be forced to suffer a cancellation of the lease on ninety days' notice of the sale to Alcazar, because (1) Alcazar was not a purchaser, but merely a straw party, a fictitious person, who had put up no money; (2) there was no bona fide offer of purchase by the real purchaser, but a complete absence of good faith and a concerted effort and scheme to divest the lessee of its property; and (3) the

agreement to buy was signed by a mere straw party and was a nullity. Having labeled Alcazar a straw party, respondent assumes that the offer of purchase was fraudulent and void under the terms for cancellation of the lease. Respondent relies upon the following authorities, which do not support its contentions. Houtz v. Hellman, 228 Mo. 655, 128 S. W. 1001, 1004; Peltzer v. Gilbert, 260 Mo. 500, 169 S. W. 257, 258; Ludwig v. Scott (Mo. Sup.), 65 S. W. (2d) 1034, 1036; Little v. Remley (Mo. App.), 101 S. W. (2d) 505, 507; and 60 C. J. 136.

Whether the offer of Alcazar was bona fide involves the construction of the provision of the lease authorizing cancellation "after the first five (5) years of the lease." The words, "providing, however, the first parties have a bona fide offer for the purchase of the above property," necessarily mean, we think, bona fide as between the parties to the lease contract. In other words, as between the lessors and the lessee, the lessors must have a good faith opportunity to sell the described property to a purchaser upon an offer of purchase satisfactory to the lessors. 32 Am. Jur., Landlord and Tenant, Sec. 833; Annotations: 35 A. L. R. 535; 116 A. L. R. 934. There is no evidence in this record that the lessors and their agents did not act in absolute good faith in trying to sell the described real and personal property. No fraud, bad faith or collusion on their part was pleaded, proven or even suggested. A sale of the property to a purchaser and at a price satisfactory to the lessors was fairly arranged and the contract of sale, and other documents, were placed in escrow with the Commerce Trust Company. The contract expressly provided that the proposed sale was subject to the option to Milner and that a sale could be effected only in the event that Milner "failed to exercise their option to buy said property at the same price and terms as offered and agreed herein." Milner was notified of the detailed terms of the contract and was given the opportunity to inspect the contract and exhibits on deposit in escrow with the Commerce Trust Company and to buy at the same price and terms. We think the evidence satisfactorily establishes that the lessors in good faith intended to sell to Alcazar at the price and upon the terms agreed upon and that they bound themselves to so sell, subject only to the option reserved to Milner. The evidence clearly indicates that Alcazar intended to buy in accordance with the terms of its contract and bound itself to do so, subject only to Milner's option. 3 C. J. S. 123, Sec. 216. The purchase of the property in question was in line with Alcazar's purchase of the other hotel properties. Regardless of where or how it obtained the funds for the down payments, the $2000 down payment was made and, thereafter, on notice that Milner had declined its option, the $8000 additional was paid. The evidence shows that Alcazar was ready, willing and able and did comply with the terms of the contract on its part.

██ ██ May respondent resist cancellation of the lease under its terms merely because it now appears that Alcazar was acting for an undisclosed principal, who furnished the money for the down payments, and to whom Alcazar may ultimately convey the described real and personal property? We may concede that Milner has a valuable right in its lease contract; that it has paid all rents provided; that it has expended large sums in repairing, redecorating and furnishing the interior of the building; that, after early losses, it now expects to operate at a profit; and that the lease may not be cancelled except in compliance with its terms. There is nothing, however, in the terms of the lease which bars a bona fide offer of purchase by an agent of an undisclosed principal, nor the acceptance of such offer by the lessors, subject to the lessee's option. The lease, from its inception, had provided for cancellation under specified conditions. Respondent Milner in effect takes the position that, before it can be required to buy the property or suffer cancellation of the lease, the lessors must have a bona fide offer of purchase by a good faith purchaser, who is financially responsible for the purchase price, independent of the security of the property purchased, and who is not purchasing for immediate resale, nor as the agent for an undisclosed principal, and regardless of the desire of such undisclosed principal or its agent to acquire title and possession of the leased property. The lease contract is not so written and it may not be so construed.

The evidence fails to show any suggestion of fraud as between the lessors and Alcazar. There were no false representations as to its corporate structure or financial responsibility; nor any express or implied representation that it was purchasing for its own use or for someone other than Mr. Graff; nor that it was not acting for Mr. Graff. See, Straw Men in Real Estate Transactions; Washington University Law Quarterly (Feb. 1940), Vol. 25, pp. 232, 257. No fraud was shown by the evidence that Mr. Graff, apparently desiring to conceal his identity from the vendors, had Alcazar act as agent for him without disclosing its agency and contract for the described property in its own name and make the down payment with funds furnished by him. Respondent insists that the purpose was to avoid personal liability for the unpaid balance of the purchase price. If so, such purpose was legitimate and proper. In the case of Mesker v. Harper Real Estate & Investment Company (Mo. App.), 221 S. W. 407, it was held that to procure a loan by making a conveyance for a nominal consideration to a straw man, and causing him to execute a note secured by a deed of trust on the property conveyed, and thereafter to reconvey to the original grantors subject to the deed of trust, but without a provision for personal liability on their part for the purpose of making the property alone the security for the amount borrowed, was not improper. This holding was, in effect, approved by this court in banc in the case of State ex rel. Mesker v. Reynolds

(in banc) (Mo. Sup.), 245 S. W. 1065, 25 A. L. R. 1484. See, also, Yeomans v. Nachman, 198 Mo. App. 195, 207, 198 S. W. 180; Sporing v. Dittmeier (Mo. App.), 213 S. W. 176, 177; and "Straw Men in Missouri" by McCune Gill, Missouri Bar Journal (April 1943), Vol. 14, p. 98. The use of a straw party in transferring real estate is not in itself unlawful or fraudulent. Orrick v. Heberer (Mo. App.), 124 S. W. (2d) 664, 668; Holt v. Joseph F. Dickman Real Estate Co. (Mo. App.), 140 S. W. (2d) 59, 63. The fact that the offer for the purchase of the property was by the agent of an undisclosed principal did not prevent the offer from being a bona fide one within the terms of the lease, nor was the acceptance of such offer, subject to the lessee's right of election to purchase or suffer a cancellation of the lease, any fraud on the lessee.

■ Did respondent offer "to purchase the property for the price named in such offer (of Alcazar) in accordance with its rights under the lease?" The parties concede that the word "price" as used in the lease means "price and terms," or "terms of sale." Respondent contends that its offer "equalled" or "was a better offer," "sounder and more substantial" and "more acceptable" than the offer of Alcazar, because "there was no subterfuge connected with it" and respondent was financially responsible and "intended to own and operate" the hotel. Respondent further insists that its offer was a substantial compliance with, and substantially met, the offer of Alcazar; that respondent exercised its option and was not in default; and that lessors could not reject the counter offer, sell to Alcazar and cancel the lease on 90 days notice of such sale. However, all of respondent's offers were conditional ("if ■ Alcazar Hotel Company's offer is bona fide") and respondent stands on the proposition that the offer of Alcazar was not bona fide. No unqualified counter offer was made. Further, respondent insisted upon two conditions, clearly set forth in its telegram of November 23, 1942, which were not included in the contract with Alcazar. Respondent now says that, in view of the contingent liabilities of Alcazar, its offer was the equivalent of the offer of Alcazar. The other condition was required by respondent's established business policy (15 days notice to correct any default). Whether an offer with different terms was a better offer or as good an offer was a matter for the determination of the vendors. The counter offer was not a compliance with the terms of the lease, nor in law the equivalent of the offer of Alcazar. Respondent did not exercise its "prior right to purchase the property at the price named in said offer" of Alcazar. By making a counter offer, different in terms, respondent rejected the offer of the lessors (made under the terms of the lease) to sell the property to respondent at the same price and terms as set forth in the contract with Alcazar. State ex rel. Johnson v. Blair, 351 Mo. 1072, 1078, 174 S. W. (2d) 851, 855, and cases cited; 35 C. J. 1042, Sec. 186.

■ Finally, respondent insists that the trial court's findings are not against the weight of the evidence and that we should defer to such findings because the chancellor saw and heard the witnesses and was in a better position to determine their credibility. In this case, however, there is little or no dispute as to the decisive facts. The contention is overruled.

We hold that the offer of Alcazar was a bona fide offer for the purchase of the described property; that a valid contract to purchase was entered into, subject to respondent's option; that respondent was duly notified thereof and given the "prior right to purchase the property at the price named in said offer"; that respondent rejected the option to purchase at said price; that the respondent received notice of the completion of the sale to Alcazar and the lease was cancelled; that respondent had 90 days from the date of the notice of cancellation (rent free) within which to vacate the building and surrender possession of the described property to the lessors; that respondent is liable in damages for any delay; that Alcazar fully complied with the terms of its contract, became entitled to possession of the leased property, as against the vendors, on February 15, 1943; and that it is entitled to relief on its cross petition for loss by delay.

■ Other matters must be determined. Plaintiffs further sought a construction of the provision of the lease by which the lessee agreed to carry public liability "policies in amount sufficient to protect first parties" (lessors). Lessors agreed to "maintain and keep in good state of repair the exterior of the building, including the roof." One Collins was injured on May 8, 1941, while walking in an alley back of the building, when two sections of downspouting, attached to and forming a part of the building, fell and struck him. He sued both the lessors and the lessee for damages (res ipsa loquitur negligence). The lessee had no public liability policies to protect the lessors (or wherein lessors were named as insureds). The case was compromised and settled and the expense divided between lessee's insurer and the lessors. Plaintiffs (lessors) sought a construction of the lease, which would require respondents to reimburse them for this outlay, and prayed judgment for the amount paid out. As applicable to this issue, the decree merely held that Milner had not breached the terms of its lease. Appellants (plaintiffs) assign error on this holding and upon the court's failure to award damages for said breach.

"The entire hotel building and site" was leased to respondent. Respondent did not carry public liability policies to protect the lessors. This was a breach of the lessee's covenant. Not being protected, the lessors had to share the cost of the Collins' settlement. Lessors' liability to Collins arose, prima facie, from lessors' negligent failure to "maintain and keep in good state of repair the exterior of the building." Failure, if any, to keep in repair the exterior of the building was a breach of the lessors' covenant with the lessee. But clearly the

848

purpose and intent of the parties, from the language used, was that the lessee should carry liability insurance to protect the lessors from liability which might arise on account of negligence of the lessors. While the facts upon which such liability for negligence was based may be some evidence of a breach of the lessors' covenant with the lessee, such a breach was not pleaded, nor shown by the evidence, █ and the lessors should not be denied recovery. The measure of damages is the loss sustained by the lessors and they are entitled to recover such loss. Jacksonville, M. P. R. & N. Company v. Hooper, 160 U. S. 514, 529; Franck v. Stout, 139 Wis. 223, 120 N. W. 867; Weber Imp. Co. v. Acme Harvesting Machine Co., 268 Mo. 363, 370, 187 S. W. 874; Nemela v. Coca-Cola Bottling Co. (Mo. App.), 104 S. W. (2d) 773, 776.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.