CARLTON R. BENTON, Administrator of the Estate of W. H. DAVIS, Deceased, et al., v. ALCAZAR HOTEL COMPANY, a Corporation, Appellant, MILNER HOTELS, INC., a Corporation.—No. 39528.—194 S. W. (2d) 20.

Division One, April 8, 1946.

Rehearing Denied, April 30, 1946.

*Joe Levin,* ·*B. T. Hurwitz* and *Chas. N. Sadler* for appellant.

*H. M. Langworthy* and *Allan M. Fisher* for respondents Carlton R. Benton, Administrator, et al.; *Raines, Glenn & Garlinghouse* of counsel.

*Hook & Thomas, Harry L. Thomas* and *Inghram D. Hook* for Milner Hotels, Inc.

■ VAN OSDOL, C.—Action under the Declaratory Judgment Act, Art. 14, Chap. 6 R. S. 1939, Mo. R. S. A. Art. 14, Chap. 6. This is a second appeal. See now Benton v. Alcazar Hotel Company, 352 Mo. 836, 180 S. W. 2d 33, where, upon the first appeal, a judgment of the trial court was reversed and the cause remanded for further proceedings not inconsistent with the opinion. Upon remand the trial court entered a provisional decree under date of May 22, 1944, in accordance with which decree the possession of the property involved (Reid Hotel) was taken over by defendant Alcazar Hotel Company on the following May 31st. Thereafter, the case was set for further hearing upon issues of damages, and upon other issues raised by plaintiffs' petition for further relief filed subsequently to the remand; evidence was heard; and a final judgment and decree was rendered. Among other issues resolved by the final judgment and decree were the issues of damages for delay in surrendering the possession of the property, for injury to the building, and for removal of fixtures. Upon these issues the trial court awarded defendant Alcazar Hotel Company $23,944.33 damages against Milner Hotels, Inc., defendant. Defendant Alcazar Hotel Company has appealed from the final judgment and decree, making the contention, among others, that the damages so awarded were inadequate in an amount far in excess of $7500. After the final judgment was rendered, defendant Milner Hotels, Inc., paid the amount of damages awarded defendant Alcazar Hotel Company into the hands of the clerk of the trial court; and the trial court by supplemental order directed these moneys to be held to await the review of the case by this court.

More particularly, the trial court by its final decree found and adjudged that, since the first trial, defendant-appellant Alcazar Hotel Company (hereinafter referred to as Alcazar) had made default in the payments stipulated in its contract to purchase the Reid Hotel, and that Alcazar in equity and good conscience should not be permitted to prosecute its claims for relief except upon condition that its default be remedied. The trial court found Alcazar had entered into the contract with the knowledge of the terms and conditions of the lease theretofore entered into on November 1, 1937, between the owners (plaintiffs-respondents herein) and defendant-respondent Milner Hotels, Inc. (hereinafter referred to as Milner), under which

lease Milner had the right of possession until April 7, 1943, when it was required to vacate pursuant to notice given, January 7, 1943, by· the owners-plaintiffs. It was further found that the damages sought to be recovered by Alcazar were caused by Milner and were ▇ not caused by owners-plaintiffs; that the "yearly value" of the Reid Hotel was $20,000; and that Alcazar should (conditionally) recover $23,944.33 of Milner, that is, $22,944.33 because of Milner's delay in surrendering possession from April 7, 1943, to May 31, 1944; and the further sums of $650, on account of removal of fixtures, and $350 damage to the building during Milner's occupancy between the last mentioned dates. And the decree found and rendered judgment for the amount due (on installments, interest and taxes) from Alcazar· to the owners-plaintiffs on account of Alcazar's default in the payments stipulated in the ·contract of purchase; and other issues not material to this review were determined.

As stated, Alcazar (defendant-appellant) contends the decree was erroneous in that the damages assessed were wholly inadequate. Alcazar further contends the trial court erred in finding for owners-plaintiffs against Alcazar for installments, interest and taxes accruing during the time Alcazar was not in possession of the property; in failing to award damages in favor of Alcazar and against the owners-plaintiffs; and in holding the award of damages to Alcazar from Milner should be conditional upon the satisfaction of the award to owners-plaintiffs from Alcazar for the unpaid accrued installments, interest and taxes—especially without recognizing the lien of Alcazar's attorneys upon the damages so awarded Alcazar.

▇ According to the evidence, Alcazar, in negotiating for the purchase of the Reid Hotel (formerly the Coates House) was represented by one Benjamin F. Weinberg who testified that he, contemplating the purchase of the hotel for Alcazar, had attempted to make an inspection of the hotel but was unable to do so. It was Weinberg's further testimony that John E. Kirk, the agent of owners-plaintiffs in the negotiations, being advised that witness had been unable to examine the building and furniture, represented that the hotel was in good condition and that the furniture was in all of the rooms in accordance with the Milner lease. Because of these representations, it is insisted by Alcazar that it should recover of and from the owners-plaintiffs the difference between the real value of the hotel and its furniture and the value, which the hotel and its furniture would have had, had the representations been true. The evidence shows that the Reid Hotel is "about 65 or 70 years old," and the furniture has been used 20 to 40 years. Photographs introduced into evidence conclusively show the Reid Hotel was not in "good" condition when Alcazar came into possession May 31, 1944, and are quite persuasive proof that the premises were not in good condition at the time of the negotiations for the sale to Alcazar. However, the

evidence does not bear out Alcazar's position that it entered into the contract to purchase the hotel relying upon representations of the owners-plaintiffs or their agent, relating to the condition of the building and its furniture. Solomon E. Harrison, president of Alcazar, had "been through the Reid Hotel" prior to the signing of the contract. Benjamin F. Weinberg, agent of Alcazar, was, according to the evidence, a hotel "broker and operator"; he had resided in Kansas City for many years, and was of great experience in the hotel business; and he had operated the Kay Hotel, a few blocks from the Reid Hotel, for several years, and was familiar with that business area of the city. Before the contract was made, Weinberg, in company with Major D. Mitchell (who was responsible for securing quarters for soldiers in Kansas City during 1942 and 1943), made an inspection of the Reid Hotel, in which tour of inspection Weinberg had seen the exterior of the building, the lobby, halls, some of the rooms, toilet facilities and baths.

██ It is the position of Alcazar that it entered into the contract of purchase of the Reid Hotel with a view of availing itself of an opportunity to use the property for quartering soldiers, and evidence was introduced tending to show that the United States Army was then (1942) very much in need of housing for soldiers who, at the time and until the end of 1943, were attending schools of instruction in radio in Kansas City. A witness estimated that, considering the rate allowed by the United States Government for quartering soldiers, the hotel would have yielded (through combined military and civilian occupancy during the period from February 15, 1943, to June 1, 1944) a net profit of $86,865.43, of which net profit, Alcazar contends, the profit upon military occupancy should have been included as an element of damages against owners-plaintiffs and Milner.

There was no definite undertaking on the part of the United States Government to house soldiers in the Reid Hotel; ██ and the evidence shows Major Mitchell had made no definite commitment, written or oral, to quarter troops in the hotel. In this respect the facts differ from those of Minneapolis Threshing Machine Co. v. Bradford, 206 Mo. App. 609, 227 S. W. 628, wherein the vendee "had *already* obtained the job of threshing (for) a *definitely* ascertainable number of customers with a *definite* amount of wheat to thresh . . . ." After Major Mitchell and Weinberg had made their inspection, mentioned supra, of the Reid Hotel, Major Mitchell told Weinberg that the hotel could be used for quartering soldiers if it were renovated and made to comply with Army rules and regulations. Major Mitchell testified generally of the rules and regulations in regard to buildings used in quartering soldiers, "We were to obtain adequate quarters for the housing of our men. They (the buildings) had to pass the Medical Corps inspection and had to prove adequate in such things as fireproof buildings, sanitation, toilet fa-

cilities, and such things." In effect, Major Mitchell's conversations with Weinberg, before and after the Major had seen the Reid Hotel, amounted to no more than statements that he needed quarters for soldiers; and that, if the Reid Hotel building were renovated, it would be inspected to determine if it, in its renovated condition, met with the requirements of the Army rules and regulations relating to buildings for the quartering of soldiers. It can be inferred from the evidence that, if the building had been renovated and if in its renovated condition it had been approved by an inspector, the building probably would have been used in quartering soldiers to the extent of full military occupancy until the summer months of 1943; and then the extent of military occupancy would have decreased until the end of the year, when the "last ones graduated December 31." However, according to the evidence, although Major Mitchell had difficulty in providing quarters in Kansas City for the soldiers of his command, and the Reid Hotel was not made available for quartering soldiers, yet soldiers under the command of Major Mitchell in Kansas City were nevertheless adequately quartered. And, the arrangements made for quartering soldiers (in those buildings which upon inspection were approved) were never for a definite period, but were upon a day-to-day basis and were oral, at least until June or July 1943; "you could notify them on a 24-hour basis." Under the facts, we consider anticipated profits (based upon assumed military occupancy) prevented by the delay in giving possession of the Reid Hotel to be too conjectural, contingent and uncertain to be and constitute an element of damages. Spruce Co. v. Mays, 333 Mo. 582, 62 S. W. 2d 824; United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 295 S. W. 109, and cases therein cited.

But it is urged by Alcazar that the "yearly value" of the Reid Hotel property was much more than $20,000, and evidence was introduced tending to show that the value of use of the property through civilian occupancy was far in excess of that sum per year. There was, also, evidence introduced by Milner that the value of the use of the property was much below that sum. And it is seen that the contract of lease between Milner and owners-plaintiffs, entered into in the year 1937, stipulated an annual rental of $10,000. Moreover, there was evidence introduced indicating that Milner operated the hotel at an aggregate loss of $2,599.46 for the months of February (1943) to and including May 1944. Having reviewed the conflicting evidence, and giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, we believe the trial court's finding of the value of the use of the property at $20,000 a year should be upheld.

Relating to the contention of Alcazar that the damages assessed for injury to the building itself during the delay in giving possession to Alcazar, and the damages due to shortages in the inventory of

furnishings and equipment were inadequate—testimony on these issues was greatly in conflict and opinion evidence widely varied as to the extent of waste or injury to the structure of the building and as to the extent of the shortages of furnishings. In a comparison of an inventory made November 3, 1937 (when Milner took possession of the Reid Hotel as lessee of owners-plaintiffs), and an inventory made in June 1944, a shortage was disclosed in many classifications of equipment and furniture; and an overage in some other classifications was shown. There was a conflict in the testimony relating to the number of rooms unfurnished when Milner came into possession of the hotel in 1937; some of ·the ▓▓▓ witnesses stated the rooms unfurnished were five or six, while others stated the number of rooms unfurnished was twenty or thirty. May 31, 1944, there were about fifty rooms (of the total number of 186) unfurnished, or practically unfurnished. It appears that Milner had, during its tenure, substituted metal furniture for the original wooden furniture in ninety rooms, and had removed the wooden furniture to the Savoy Hotel (also operated by Milner). In 1943 the metal furniture was removed from the Reid Hotel and wooden furniture returned. Some of the witnesses testified that the furniture returned was in bad condition and of little value; others stated the furnishings were in better condition when Milner vacated the premises, in 1944, than in 1937. But it is clear that all of the furniture of the Reid Hotel (though "up-to-date" and adequate for the service of the guests of the old Coates House when the furniture was originally installed) had become worn and damaged by use and obsolescent. In an appraisal of the estate of an owner-plaintiff's decedent mäde in July 1944 all of the furniture and equipment of Reid Hotel was valued at $4138. · There was amply sufficient substantial evidence, if credible, justifying the amount of the trial court's assessment of damages for injury to the building and for removal of furniture and fixtures, when the condition, former use, and age of the building and its furniture and· fixtures are considered. The trial judge saw the various witnesses upon the witness stand and was better enabled by his observation of their conduct and demeanor to determine the credibility and the weight to be given to their testimony than are we, and we defer to his findings upon these issues.

▓▓▓ Now, as has been noted, the trial court found for Alcazar against the defendant Milner in damages for the delay between the dates of April 7, 1943, and May 31, 1944. The trial court made no finding in favor of Alcazar in damages for the delay as against the owners-plaintiffs. This was not a compliance with the mandate of this court in the case of Benton v. Alcazar Hotel Company, supra. Strictly, Alcazar had a claim against owners-plaintiffs for damages due to the delay in surrendering possession from February 15, 1943, to May 31, 1944. The owners-plaintiffs had a claim against Milner

for Milner's delay in surrendering possession from April 7, 1943, to May 31, 1944. Reading the opinion in the case of Benton v. Alcazar Hotel Company, supra, it will be seen that this court decided Alcazar "became entitled to possession of the leased property, as against the vendors (owners-plaintiffs) on February 15, 1943; and that it (Alcazar) is entitled to relief on its cross petition for loss by delay." 352 Mo. at page 847, 180 S. W. 2d at page 39. In the instant case, the trial court, in adjudicating the rights of the parties (and apparently invoking a theory of subrogation whereby Alcazar recovered directly from Milner), failed to take into account an element of damage due Alcazar for delay as measured from and including February 15, 1943, to April 7th of that year. However, the judgment (erroneous in this respect) is not, if modified as we direct infra, unjust or prejudicial to Alcazar since, as stated, the amount of the award, $23,944.33 (rendered against Milner in favor of Alcazar), has been paid into the custody of the trial court. It is directed that the judgment and decree be modified to award Alcazar a further sum, $2794.52, although from owners-plaintiffs, as damages for failure and delay in surrendering possession to Alcazar upon and after the day stipulated in the contract, February 15, 1943.

Alcazar has elected to affirm its contract of purchase and to recover damages for delay in giving the possession provided in the contract, and thus has sought to place itself in all respects, pecuniarily, as if there had been no delay. It should not expect to so recover and not fulfill its own obligations, under the contract, to owners-plaintiffs. The finding against Alcazar in favor of owners-plaintiffs for the due and unpaid installments and interest, as provided in the contract of purchase, and for the amount of taxes for the years 1943 and 1944; and the order that the award to Alcazar should be conditional upon the satisfaction of the award to owners-plaintiffs (thus finally declaring, determining and enforcing the rights of the parties) was equitable and just. Though made in an action under the Declaratory Judgment Act, the conditional award was pursuant to the petition for further relief by owners-plaintiffs, and moreover the decree, in making the award to Alcazar conditional, was in harmony with the principle that a court generally has the inherent power to make such proper orders as are necessary to effectuate ▮ its decrees. Borchard, Declaratory Judgments, 2d Ed., p. 441; Section 1133 R. S. 1939, Mo. R. S. A. sec. 1133.

Of the contention of Alcazar that the decree deprived Alcazar's counsel of their lien for compensation upon the finding and decree in favor of Alcazar. Of course, counsel for Alcazar had a lien for their compensation upon the claims of Alcazar, which lien now attaches to the awards in favor of their client by the finding and decree of the trial court, and as we have modified supra. Section

13337 R. S. 1939, Mo. R. S. A. sec. 13337. Such lien, however (if it be necessary for Alcazar's counsel to enforce it), would be subsequent and subservient to the right of owners-plaintiffs to have Alcazar's relief upon its claim made conditional upon satisfaction of the claim of owners-plaintiffs as by the judgment and decree declared and determined, inasmuch as the claims of owners-plaintiffs and of Alcazar arose in the course of this very action and inhered in and arose out of the same transaction. State ex rel. Hinde v. U. S. Fidelity & Guaranty Co., 135 Mo. App. 160, 115 S. W. 1081. See also Kansas City Rapid Motor & Transp. Co. v. Young, 188 Mo. App. 289, 175 S. W. 95; Roberts v. Mitchell, 94 Tenn. 277, 29 S. W. 5; Dunkin v. Vandenbergh, 1 Paige 622.

The judgment and decree, as modified, is affirmed and the cause is remanded.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—Re-examining the case, we have reached the conclusions that annual payments of installments as provided in the contract of October 3, 1942, should be made as of December 26th of each year; and that semi-annual interest upon deferred and unpaid balances of principal should run from December 26, 1942. This date was that upon which Alcazar paid $8000 into the hands of the escrow depositary. It was provided in the contract of purchase that this sum should be paid within five days after Alcazar was notified that Milner had refused to exercise its option to purchase. It, therefore, seems that December 26, 1942, became, under the facts, the time when the parties contemplated the contract of purchase should become effective in transferring the equitable title to the property, and the time when Alcazar became definitely obligated under the contract of purchase.

The trial court's judgment and decree should be further modified to comply with our views in these respects, and it is so ordered.

The motion for rehearing or to transfer the cause to the Court en Banc is overruled.