Woodrow **TINNON**, Plaintiff-Appellant,

v.

Sam **TANKSLEY**, Defendant-Appellant.

**Dale Alcorn and Delmar Alcorn, d/b/a Alcorn Bros. Real Estate, Defendants-Respondents.**

No. 51553.

Supreme Court of Missouri, Division No. 1.

Nov. 14, 1966.

**100**

Roderic R. Ashby, Charleston, for plaintiff-appellant.

Dwight Crader, Sikeston, for defendant-appellant.

HOUSER, Commissioner.

The named purchaser in a written contract for the sale of 80 acres of land, Woodrow Tinnon, filed a suit in two counts against the sellers named in the contract, Sam Tanksley, and Dale and Delmar Alcorn, d/b/a Alcorn Bros. Real Estate. Count I sought specific performance of the contract. Count II sought to recover down payments of $4,000 and damages for breach of contract in the sum of $2,000. Defendants filed a general denial and a counterclaim for recovery of possession of the land, for $5,000 for unlawfully withholding possession of the land (Tinnon was a tenant on the land at the time he signed the contract to buy it) and for $2,400 for rents and profits. The court found that the contract was rescinded and denied specific performance; that plaintiff was entitled to the return of his $4,000 and that defendants were entitled to rents and profits in the sum of $1,600, and rendered judgment accordingly. Plaintiff Woodrow Tinnon and defendant Sam Tanksley both appealed.

Title to real estate is involved within the meaning of Art. V, § 3, Constitution of Missouri, V.A.M.S.; Price v. Ridler, Mo.Sup., 373 S.W.2d 59[1].

We review the entire record and reach our own conclusions as to the facts, determining the weight and value to be

given the evidence, deferring to the findings of the trial court, however, when proper. Anderson v. Abernathy, Mo.Sup., 339 S.W.2d 817 [1].

Leland O'Reilly owned a 200-acre farm in Mississippi County. The farm was rented to Woodrow Tinnon. On August 19, 1963 O'Reilly and Sam Tanksley entered into a real estate contract for the sale of the 200 acres. January 10, 1964 was fixed as the closing date. On September 16, 1963 Tanksley made a written contract with Woodrow Tinnon for the sale of 80 acres out of the 200-acre tract for $34,000, $2,000 down and $2,000 upon the purchaser receiving a commitment to make a loan, "the balance in cash upon the closing of this transaction, which shall be on or before January 10, 1964." The contract was to be considered null and void and the money deposited returned to the buyer in the event the buyer should be unable to obtain the loan within 60 days after the date of the contract. Time was agreed to be of the essence. If seller kept his part of the bargain by furnishing good and sufficient title and the buyer failed to comply with the terms of the agreement within 10 days thereafter the money deposited was to be forfeited as liquidated damages, and the contract was to be thereafter inoperative, at the option of seller. (Although the real estate agents Alcorn who negotiated the deal were designated in the contract as cosellers with Tanksley, their only interest was in the commission.)

Tinnon paid $2,000 when the contract was executed. He received a loan commitment from an insurance company on November 7, 1963. On November 12, 1963 Tinnon made a second $2,000 payment. O'Reilly gave Tinnon written notice to vacate the 80 acres, effective December 31, 1963, but Tinnon did not vacate and was still in possession at time of trial in December, 1964. Tinnon did not on or before January 10, 1964 offer to pay the balance of the purchase price. He was unable to close the deal on time because he could not obtain the

signature of his wife on the loan papers. She had filed suit for divorce on February 23, 1963 and was unwilling to sign the papers. Tanksley did not at any time declare the contract void and the $4,000 forfeited when on January 10, 1964 Tinnon failed to pay the balance due on the contract. There was no communication between the parties themselves. On January 20, 1964 the attorneys employed by the insurance company to examine the title wrote to Tinnon, informing him that they had received a check from the insurance company and that "this can be closed at your convenience"; that they were authorized to hold the check "only for a time specified." Tinnon did not answer the letter or communicate with the attorneys or the sellers. Tinnon did not at any time communicate to the sellers that he was ready to close; did not tender the money and demand a deed, and did not instruct his attorney to close the deal at any time for the reason that his attorney assured him that he had talked to Tanksley and Alcorn and he thought "everything was okay," i. e., that the sellers would not do anything "to hurt Woodrow" and would "hold the 80 until Woodrow got his divorce over with." From November, 1963 until March 21, 1964 the attorneys for Tinnon and his wife were negotiating with respect to a settlement of the property rights of the parties. The sellers did not insist upon a specific date beyond which they would no longer wait. Instead, by acts and conduct, they countenanced the delay for a period of several weeks after January 10, 1964.

On January 1, 1964 a principal and interest payment became due by O'Reilly to an insurance company. O'Reilly intended to pay this debt out of the proceeds of the sale of the 200 acres to Tanksley. He made several inquiries of the Alcorns, asking when the deal between O'Reilly and Tanksley was to be closed, stating that he needed his money. Dale Alcorn and Tanksley were "fussing," "wanting Woodrow to hurry up and get this divorce over with so they could close the deal" between Tanksley and Tin-

non. They said that O'Reilly was pushing them and that they "needed to get the thing out of the way." Tinnon's attorney could not give them a definite date on which Tinnon would close the contract. It depended upon the granting of the divorce, which was indefinite as to time because the parties were still negotiating with respect to the property. Tinnon's attorney did not request of the sellers that they give a commitment postponing the closing to a specific date and no such commitment was ever made. "Off and on" during January, February and March, 1964 Tinnon's attorney would talk to Tanksley about the status of the divorce suit. Tanksley would ask "when are you going to get that divorce? We need to get this thing over with," and Tinnon's attorney would reply that they were trying to get a property settlement worked out "so that Woodrow could go ahead."

The time came when the checks sent by the insurance company for the Tinnon loan had to be returned to the company. Tanksley had paid down $5,000 earnest money on his contract with O'Reilly. Finally, under obligation to fulfill that contract and to protect his earnest money from forfeit, Tanksley on March 5, 1964 consummated his contract with O'Reilly, took a deed to the property, and on the same day made a deed of trust to Prudential Insurance Company covering the 80 acres and other lands as security for a loan the proceeds of which he applied on his debt to O'Reilly. Tanksley's attorney had previously told Tinnon's attorney that Tanksley was going to close the purchase of the 200 acres in his name and close the loan. "The general idea" was for Tanksley to close that deal in his name, "and the 80 would be held for Woodrow" until Woodrow "got his divorce over with." On March 12, 1964 Tanksley entered into a contract for the sale of the 80-acre tract to Dearmont Oliver and wife, without notice to Tinnon or his attorney and without giving Tinnon any opportunity to pay the balance due under his contract with Tanksley. The Tinnons settled their controversy over property rights on March 21, 1964 and were divorced on March 25, 1964. Tinnon, having learned of the sale of the 80 acres to the Olivers, filed this suit on May 6, 1964. Notice of lis pendens was filed on November 14, 1964. On November 17, 1964 Tanksley deeded the 80 acres to Dearmont Oliver and wife. The Olivers were not joined as parties in this action.

On his appeal Tinnon makes the point that the court erred in not granting specific performance, but if specific performance cannot be granted claims that he is entitled to a refund of the $4,000 he paid on the purchase price, plus interest.

■ There was no error in denying specific performance. Tinnon pleaded that defendants entered into a contract to convey the land *to another* and proved that after suit was filed but before trial defendants executed a warranty deed conveying the title to Dearmont Oliver and wife. This placed it out of the power of defendants to perform their contract with Tinnon. The Olivers were not made parties to this action. Specific performance could not be granted. McKown v. Driver, 54 Wash.2d 46, 337 P.2d 1068[1]. "The specific performance of a contract for the purchase of real estate may be decreed only where it is possible for the defendant to convey the land. If he has no title, or has parted with the title after the execution of the contract, the court will not grant a vain judgment." Saperstein v. Mechanics' & Farmers' Savings Bank, 228 N.Y. 257, 126 N.E. 708. This same problem was before this Court one hundred years ago in Brueggeman v. Jurgensen, 24 Mo. 87. What was said then is applicable here and now: "If we regard the suit as one to enforce the specific performance of a contract to convey lands, the petition is so framed that such relief can not be granted. It appears from the record that the title to the lot which the plaintiffs would have conveyed to them, is not in the defendant. He has passed it away for a valuable consideration, and his vendee is not made a party to the suit. Whether that

vendee is a *bona fide* purchaser, it is not necessary to inquire, as he is not before this court. It would be a vain thing, and the plaintiffs would not be at all advanced, to make a decree vesting the title of the defendant in them, when it appeared that all the title the defendant ever had has been conveyed to another." 24 Mo. 1. c. 88, 89.

 The fact that a lis pendens was filed on November 14, 1964 does not change the situation. The notice of suit under § 527.260 is constructive notice to purchasers "only from the time of filing the notice. It would not be constructive notice to a purchaser who acquired his right before the notice was filed." Abington v. O'Dell, Mo. Sup., 197 S.W. 339, 340. In Abington the party in question bought the land in 1905, paid $20 down and gave notes for $15 each, payable monthly, receiving a title bond at the time of purchase. The suit in question was filed in 1906, proceeded to judgment in 1908 and the purchaser received his deed in 1909. The notice of lis pendens was filed after he contracted for the land and before he finished his payments. The court held that the lis pendens did not affect him because "[h]e had a contract which gave him a right to the property". Abington v. O'Dell is cited among others from various jurisdictions in 93 A.L.R. 404 in support of the statement that the purchaser is in no wise affected with notice of a suit where there is an executory contract for the purchase of land entered into prior to the bringing of a suit involving the title, without making the purchaser a party thereto. The Dearmont Olivers are not purchasers pendente lite as was the purchaser in Adrian v. Republic Finance Corporation, Mo. Sup., 286 S.W. 95 [8]. As the owners of a prior executory contract for the purchase of the land they were not affected by the lis pendens filed eight months after the date their contract was executed. The fact that they received their deed after the suit was filed makes no difference under these facts. 34 Am.Jur. Lis Pendens § 12, p. 371; 54 C.J.S. Lis Pendens § 44a. Although there are some decisions to the contrary "It is

well settled that the filing of a *lis pendens* is constructive notice only as against persons acquiring title or an interest in the property in litigation after the suit has commenced. A person whose interest existed at the commencement of the suit will not be bound by the proceedings unless he be made a party to the suit." Four–G Corporation v. Ruta, 56 N.J.Super. 52, 151 A.2d 546, 551.

The right of Tinnon to recover the $4,000 must be considered in connection with Tanksley's first contention on his appeal: that he (Tanksley) is entitled to judgment on Count II of the petition because the earnest money was forfeited by Tinnon's failure to pay the balance of the purchase price on or before January 10, 1964.

The Tanksley-Tinnon contract contained this provision:

"It is understood and agreed that time is the essence of this agreement and if the seller has kept seller's part of this agreement by furnishing good and sufficient title as herein provided, and the buyer fails to comply with the requirements of this agreement within ten (10) days thereafter, then the money deposited as aforesaid shall be forfeited by the buyer, as liquidated damages, and this agreement may or may not be thereafter operative, at the option of the seller."

Because of his wife's refusal to sign the loan papers Tinnon was unable to obtain the money on the loan commitment, with which to pay the balance due and close the Tanksley-Tinnon contract on January 10, 1964.

 Ordinarily, as the authorities cited by Tanksley clearly indicate, a purchaser who without legal cause defaults in the making of payments under a contract of purchase, where time is of the essence, is not entitled to recover installments made on the purchase price. The general rule is without application, however, where the time requirements have been waived. "The vendor may waive the effect of the pur-

chaser's default and may estop himself to assert a forfeiture of the purchase money. * * * If the vendor waives the provision of the contract making time of the essence, he cannot forfeit the money paid, at least until he gives the purchaser reasonable notice of his intent to forfeit such payments." 92 C.J.S. Vendor & Purchaser § 554e.

With full knowledge of Tinnon's default in failing to pay the balance of the purchase price on or before January 10, 1964, the sellers treated the contract as still in force long after the latter date. They acquiesced in the delay. From time to time during January, February and March, 1964 they gave Tinnon's attorney express and implied assurances that they would protect Tinnon's interest and postpone the closing until the divorce was granted. There was a waiver by the sellers of Tinnon's default in not paying the balance of the purchase price by January 10, 1964.

No notice of sellers' intention to declare a forfeiture—no notice to Tinnon to perform the contract on or before a certain day in the future—was given. In the absence of any such notice the sellers cannot enforce a right of forfeiture. McGrew v. Smith, 136 Mo.App. 343, 116 S.W. 1117, 1118; Chan v. Title Ins. & Trust Co., 39 Cal.2d 253, 246 P.2d 632 [4]; Howard v. Jackson, 213 Or. 447, 324 P.2d 757 [13, 14].

No forfeiture having occurred; the purchaser's default in failing to pay the balance by January 10, 1964 having been waived; the provision that time was of the essence having been waived and the sellers having repudiated the contract by selling the property to another, the purchaser was entitled to the return of the money he deposited on the purchase price.

Next Tanksley claims that he is entitled to judgment on his counterclaim for (1) recovery of the possession of the 80 acres; (2) damages for unlawfully withholding possession, and (3) rents and profits for the years 1964–1966, both inclusive.

*Possession:* At the time the contract was made between O'Reilly and Tanksley (on August 9, 1963) the possession was rightfully in Tinnon as tenant of O'Reilly. O'Reilly gave Tinnon notice to quit, effective December 31, 1963. Tinnon did not vacate pursuant to the notice but held possession through 1964 and was still in possession as late as May 26, 1965. Ordinarily the purchaser is not entitled to possession until he has obtained his deed, 92 C.J.S. Vendor & Purchaser § 284, p. 154, but the contract of sale may confer a right of possession prior to that time. The O'Reilly-Tanksley contract provided that "Possession of the various fields shall be delivered to the Purchaser upon harvesting of the fall crops." When the fall crops were harvested was not shown, but assuming that they were harvested by December 31, 1963, the day on which Tinnon was obliged by the notice to vacate, Tanksley had the right to possession of the fields beginning January 1, 1964. The Tanksley-Oliver contract provided that "Possession of said premises [the 80 acres] shall be delivered to Buyer upon the execution of this agreement * * *." The agreement was executed on March 12, 1964. Tanksley was entitled to possession from January 1, 1964 to March 12, 1964, when his right to possession was contracted away. Accordingly, Tanksley had no right to possession at the time of trial and has none now.

*Damages:* Tanksley's claim for damages is based upon unlawful withholding of the possession of the land. He claims that Tinnon's illegal possession has prevented him from delivering possession to his grantees, the Olivers, and has subjected him to a claim for damages for failure to deliver possession. The Olivers as purchasers conceivably may maintain a claim for damages against Tanksley for delay in delivering possession, from the date they were entitled to possession (March 12, 1964). Benton v. Alcazar Hotel Co., 354 Mo. 1222, 194 S.W.2d 20 [5]. There is no evidence, however, that they have done so or that Tanksley has sustained any actual dam-

age in this connection, and therefore an award of damages on this possibility at this time would be speculative and premature. The present decision is not to be construed as a bar to any future action between Tanksley and Tinnon if and when Tanksley shall have sustained actual damage by reason of claims made by the Olivers, based upon the unlawful withholding of possession from them.

 *Rents and profits:* Rent is an incident to the reversion and passes with it unless the lessor severs the rent from the reversion by expressly reserving it. Equitable Life Ins. Co. v. Bowman, 225 Mo.App. 855, 32 S.W.2d 126; White v. Irvine, 324 Mo. 342, 22 S.W.2d 778; 92 C.J.S. Vendor & Purchaser § 288 a. The O'Reilly-Tanksley contract provided that the rental should go to the sellers "prorated to date of delivery of the deed and to the buyer thereafter." The Deed from the O'Reillys to Tanksley was dated March 5, 1964 and recorded March 10, 1964. There is no evidence of date of delivery but assuming delivery on the day it was executed Tanksley's right to rent commenced on March 5, 1964. The Tanksley-Oliver contract, dated seven days later, March 12, 1964, contains no reservation of rent and no express agreement as to rent, in which case ordinarily the grantees' right to rent would commence as of the date of the conveyance to them (November 17, 1964). This contract, however, provided that possession be delivered to the grantees Oliver upon the execution of the agreement, and that the Olivers should pay interest on the note and deed of trust on the premises held by the Prudential Insurance Company *from the date of the agreement* (March 12, 1964). Under these facts Tanksley was not entitled to the rent after March 12, 1964, on the principle that one party should not have both the property and the purchase money or the proceeds thereof

without accountability for either. Tanksley, having the right to the use of the property from March 12 to November 17, 1964, and being relieved of the payment of interest from March 12, is not entitled to the rents and profits during the interim. 92 C.J.S. Vendor & Purchaser § 288 d. Tanksley's right to rents and profits, therefore, commenced March 5, 1964 and ended March 12, 1964. The evidence showed that the reasonable value of rents and profits was $25 to $30 per month. Although it approaches a *de minimus* situation, Tanksley's right to rent is restricted to a recovery of $7.50.

 Tinnon is not entitled to interest on the $4,000. Although Tanksley was in the wrong Tinnon was also at fault in not living up to his agreement to close the transaction on time. In this equitable action, in which the allowance or disallowance of interest is discretionary, we will not allow interest under these circumstances.

Accordingly, the judgment of the circuit court on Count I, denying specific performance, is affirmed. The judgment on Count II, for plaintiff and against defendant Tanksley, for $4,000 is affirmed. The judgment on the counterclaim for defendant Tanksley and against plaintiff is affirmed on the merits, but the amount of the award thereon is reduced from $1,600 to $7.50. The cause is remanded with instructions to set aside the original judgment of April 18, 1965 and enter a new judgment as of that date in conformance with the views expressed in this opinion.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.